Argued June 3, 1915, reargued September 4, 1917, and again on November 26, 1918, reversed and remanded December 31, 1918, rehearing denied February 18, 1919.

## STEVENS *v.* MYERS.

### (177 Pac. 37.)

For former opinions, see 62 Or. 372 (121 Pac. 434, 126 Pac. 29).

**Appeal and Error—Equity Suit.**

1. A suit in equity on appeal is tried *de novo*.

**Appeal and Error—Rehearing—Divided Court.**

2. Though Laws of 1913, page 294, require affirmance of judgment on evenly divided court, Supreme Court has discretion to grant rehearing in such case.

**Appeal and Error—Disposition—Affirmance for Lack of Concurrence of Four Justices—Reargument—Statute.**

3. Affirmance of decree appealed from for lack of concurrence of four justices of Supreme Court *held* not required by Laws of 1913, page 294, though rearguments were necessary to produce concurrence of four justices.

**Wills—Execution of Wills by Husband and Wife—Sufficiency of Evidence.**

4. In suit against testator's son by his daughter claiming under mutual wills executed by testator and his wife, evidence *held* to show

that both testator and his wife executed their respective wills at the same time and in the same manner.

**Wills—Mutual Wills—Construction.**

5.   First clause of identical wills executed by husband and wife *held* absolute devise of all property from testator or testatrix to survivor of them, third clause showing purpose of both that when both should die their son and daughter should have all of property of both.

**Wills—Mutual Wills—Execution Pursuant to Agreement—Acceptance of Bequest—Effect.**

6.   Where testator and wife executed mutual wills of identical import, leaving all property to each other, wills showing purpose that when both should die son and daughter should have all property, and being executed pursuant to agreement and supported by consideration, testator who survived wife and took her property, could not disinherit daughter and leave practically whole estate to his son.

**Wills—Mutual Wills—Sufficiency of Evidence.**

7.   In suit against son by daughter claiming under mutual wills of testator and wife, evidence *held* sufficient to show agreement between testator and wife, supported by valid consideration, to make such mutual wills, which indicated children as ultimate beneficiaries.

Burnett, J., dissenting.

[As to joint, mutual, reciprocal or multi wills, see note in 136 Am. St. Rep. 592.]

From Multnomah: Robert G. Morrow, Judge.

In Banc.

It is alleged that the plaintiff and the defendant are brother and sister and the only children of George Tobias Myers and Sally S. Myers, his wife; that by their mutual effort and joint labor the father and mother accumulated a large amount of property; that at the time of the making of the alleged agreement and the execution of their respective wills, the parents were the owners in their respective rights of valuable real estate and personal property in the City of Portland; that while they were such owners George T. Myers, the father, promised and agreed to and with Sally S. Myers, the mother, for and in consideration of her making and executing her will in and by which

she would convey and bequeath to George T. Myers all of her property, both real and personal, which she might own at the time of her death, and therein further providing that in the event that she should die first all of the property of every kind which she might own at the time of her death should be divided equally between their son and daughter, the plaintiff and the defendant, that he, George T. Myers, would make and execute his will in and by which he would devise and bequeath to his wife, Sally S. Myers, the mother of the plaintiff and the defendant, all of the property which he might own or in which he might have an interest at the time of his death; and he would further provide in his will that if his wife should die first, then and in that event all of the property which he might own or in which he might have an interest at the time of his death should be equally divided between the plaintiff and the defendant; that the mother and father joined in said agreement to make and execute said wills and promised and agreed with each other to make such wills; that pursuant thereto and in compliance with such agreement, George T. Myers and Sally S. Myers, husband and wife and the father and mother of the plaintiff and the defendant, did on February 11, 1896, duly and regularly make and execute their respective wills as follows:

MR. MYERS' WILL

"I GEORGE T. MYERS, of Portland, Oregon, being of sound and disposing mind and memory, do make, ordain, publish and declare this my last Will and Testament as follows, hereby revoking all former Wills made by me.

I.

I give, devise and bequeath all of my property, and estate, real and personal, of every name, nature or description, and wheresoever situate or being, to my beloved wife, Sallie S. Myers, to have, possess and hold the same in her own right.

II.

I intentionally omit giving anything to my children, Georgia Frances Stevens and George Tobias Myers, Jr., knowing that my wife will care and provide for them.

III.

In case of the death of my said wife, Sallie S. Myers, before my death, then, and in that event, I give, devise and bequeath all of my property and estate, real and personal, of every name, nature or description, and wheresoever situate and being to my said children, Georgia Frances Stevens and George Tobias Myers, Jr.

IV.

I do hereby nominate and appoint my said wife, Sallie S. Myers, executrix of this, my last Will and Testament, and direct that no bond or undertaking shall be required of her as such executrix.

V.

In case of the death of my said wife, Sallie S. Myers, before my death, so that the third provision of this, my said Will, shall then be operative, I do then, and in that event, nominate and appoint my said children, Georgia Frances Stevens, executrix, and George Tobias Myers, Jr., executor of this, my last Will and Testament, and direct that no bond or undertaking shall be required of them, or either of them, as such executrix and executor."

MRS. MYERS' WILL

"I, SALLIE S. MYERS, of Portland, Oregon, being of sound and disposing mind and memory, do make, ordain, publish and declare this my last Will and Testament as follows, hereby revoking all former Wills made by me.

I.

I give, devise and bequeath all of my property, and estate, real and personal, of every name, nature or description, and wheresoever situate or being, to my beloved husband, George T. Myers, to have, possess and hold the same in his own right.

II.

I intentionally omit giving anything to my children, Georgia Frances Stevens and George Tobias Myers, Jr., knowing that my husband will care and provide for them.

III.

In case of the death of my said husband, George T. Myers, before my death, then, and in that event, I give, devise and bequeath all of my property and estate, real and personal, of every name, nature or description, and wheresoever situate and being, to my said children, Georgia Frances Stevens and George Tobias Myers, Jr.

IV.

I do hereby nominate and appoint my said husband, George T. Myers, executor of this, my last Will and Testament, and direct that no bond or undertaking shall be required of him as such executor.

V.

In case of the death of my said husband, George T. Myers, before my death, so that the third provision of this, my said Will, shall then be operative, I do then, and in that event, nominate and appoint my said children, Georgia Frances Stevens, executrix, and George Tobias Myers, Jr., executor, of this, my last Will and Testament, and direct that no bonds or undertaking shall be required of them, or either of them, as such executrix and executor."

On January 18, 1902, Sally S. Myers died and at the time of her death she was the owner in fee simple, in her own right, of all of the real estate which she owned at the time their respective wills were executed, and both of said wills were then in full force and effect as they were when executed on February 11, 1896. It is further alleged that upon the death of Sally S. Myers, George T. Myers as her surviving husband caused her will to be duly and regularly proved and admitted to probate in the County Court of Multnomah County, Oregon; that pursuant to its provisions he was duly appointed and qualified as executor of such will and discharged the duties thereof and that upon the settlement of her estate he took and accepted, under the will, all of the real estate and personal property which the said Sally S. Myers owned at the time of her death, the said real estate being specifically described.

It is averred in the complaint that after he had obtained and acquired such real property pursuant to such will and while he was the owner thereof, the said George T. Myers on May 31, 1902, in violation of said promise and agreement made with his wife on February 11, 1896, annulled and destroyed his will executed pursuant to the terms and conditions of said agreement and executed another and a different will, by which he bequeathed to his daughter, the plaintiff Georgia Frances Stevens, the sum of $20,000, to be paid to her when she should arrive at the age of forty-five years, and in case of her death before his own death or before she should reach the age mentioned, then the $20,000 should go to his son, George Tobias Myers, Jr., to whom he also devised the residue of his property, both real and personal, and whom he named as sole executor of such will. On December 3, 1902,

he executed a codicil thereto, in which it was provided that if his son, George T. Myers, Jr., should die before himself, then $20,000 should be given to the Children's Home of Portland, $20,000 to the Taylor Street Methodist Episcopal Church of Portland, $20,000 to a nephew, and the remainder of his property to certain of his nephews and nieces. Henry L. Pittock was named therein as executor.

On July 12, 1907, George T. Myers died and upon petition therefor his last will and testament above described, with the codicil attached thereto, was duly admitted to probate in Multnomah County, Oregon, and pursuant to its terms the defendant was duly appointed as executor of that will and qualified as such. It is alleged that all of the debts and expenses of the estate have been paid in full and that at the time of his death George T. Myers was the owner of certain real property described; that in addition to said real estate he was also the owner of valuable salmon fisheries and fishing rights in the territory of Alaska, from which large profits have been made; that he also owned a large amount of personal property, the nature and amount of which are to the plaintiff unknown, of which the defendant has taken the sole and exclusive possession and now claims to be the exclusive owner thereof; that the latter refuses to carry out or comply with the agreement alleged to have been made between the father and the mother at the time of the execution of their respective wills on February 11, 1896, or to convey to the plaintiff one half, or any, of the property, which rightfully belongs to her and to which she is entitled under the terms and provisions of such respective wills, and refuses to account to her for the rents, issues and profits or any part thereof.

The plaintiff and the defendant were the only children of George T. Myers and Sally S. Myers and the plaintiff contends that but for the violation of the alleged agreement by the father, all of the property owned by him at the time of his death would have been devised and bequeathed to the plaintiff and the defendant in equal parts. Based upon such allegations, she prays for the court to declare and decree a specific performance of the alleged agreement made between the father and the mother at the time of the execution of their respective wills; that the plaintiff be declared to be the owner of one half of all the property which her father owned at the time of his death; that the defendant hold the same as trustee for her and that he be required to account to the plaintiff for one half of all such property, including the rents, issues and profits thereof.

The defendant filed an answer in which he admits that he is the brother of the plaintiff and that they are the only children of George T. Myers and Sally S. Myers, both of whom are now deceased; that the latter had accumulated a large amount of property during their lifetime and that Sally S. Myers was the owner of her real property described.

The record does not show what was done with the will of George T. Myers executed on February 11, 1896, but Mr. Boise testifies that soon after the death of Mrs. Myers, Mr. Myers made another will, in which he left a nominal sum only to his daughter. However, there is no other evidence of that will in the record, although it is admitted that George T. Myers did execute another and different will on May 31, 1902. The defendant denies the execution of any will by George T. Myers on February 11, 1896, but admits the execution of the will of Sally S. Myers on that date,

although denying that it was made or executed pursuant to any agreement as alleged, or otherwise "than in the execution of an intent, purpose and design on the part of said Sally S. Myers to dispose of whatever property she might have at the time of her death, in accordance with the provisions made and set out in her said will"; and in legal effect denies every material allegation of the complaint. As a further and separate answer, the defendant alleges the probating of the will of George T. Myers on July 22, 1907, and the initiation and filing of a contest by the plaintiff against the probate of said will on December 19, 1907, based upon the allegation that the said George T. Myers at the time of the execution of the said will was acting under an insane delusion and that such will was invalid; that the validity of such will, however, was sustained by decree of this court: *Stevens* v. *Myers,* 62 Or. 372 (121 Pac. 434, 126 Pac. 29); and that by the initiation of such contest the plaintiff made her election and is now estopped to maintain or prove the allegations made in her complaint. A reply was filed and after testimony was taken, the trial court on January 22, 1914, made its findings of fact and conclusions of law and rendered a decree against the plaintiff, dismissing her complaint and assessing costs against her, from which decree plaintiff appealed.

The case was first argued and submitted *in banc* on June 3, 1915, reargued on September 4, 1917, and again reargued on November 26, 1918, Mr. Justice HARRIS not sitting at any of the hearings for the reason that he considered himself disqualified. On June 17, 1917, the defendant filed a motion here to affirm the decree of the lower court, on the ground that the members of this court were then equally divided upon the issues between the plaintiff and the defendant.

On May 2, 1918, the defendant filed another motion to affirm the decree of the lower court, for the reason that the members of this court were then evenly divided upon the merits of the case and that about eight months had elapsed since the case was reargued and submitted. No decision was ever rendered on either of said motions and they were again renewed at the time of the last argument.

It is alleged that the promises, agreements and contract between the father and the mother were not in writing; that the plaintiff does not know and therefore cannot specify the exact date when they were made, but on information and belief charges that they were made on or a short time prior to February 11, 1896. The wills of that date were prepared by Whitney L. Boise, an attorney of this court, at his office in Portland, and were executed at the same time and on the same day, in the presence of the same witnesses. After execution both wills were returned to Mr. Boise and deposited in the safe in his office, where they remained until after the death of Sally S. Myers, when her will was taken out and probated by her husband. The record does not show what was done with the will of George T. Myers executed on February 11, 1896, but it is admitted that he executed another and different will on May 31, 1902, about four months after the death of his wife, and that the codicil to his last will was executed on December 3, 1902. Exclusive of the contents of the respective wills and the fact that both were executed at the same time and on the same day, in the presence of the same witnesses, there is no other evidence of any writing tending to show any contract or mutual compact between George T. Myers and Sally S. Myers or that one will was made in consideration of the other, and the oral evidence of such a con-

tract is confined to the testimony of Mr. Boise, who drew the wills, and that of the plaintiff and her husband.

The question is thus presented as to whether the wills of George T. Myers and Sally S. Myers of February 11, 1896, were executed pursuant to an agreement and, if so, what is the legal force and effect of such agreement; and whether the plaintiff as the surviving daughter of the deceased father and mother can now enforce that agreement against her brother, the surviving son, as to property which he received under the terms and provisions of the will of George T. Myers executed May 31, 1902.

> REVERSED.  DECREE ORDERED.
> REMANDED FOR AN ACCOUNTING.

For appellant there was a brief over the names of *Mr. W. Lair Thompson, Mr. Roscoe C. Nelson* and *Messrs. Emmons & Webster,* with oral arguments by *Mr. Arthur C. Emmons, Mr. Thompson* and *Mr. Nelson.*

For respondents there was a brief over the names of *Mr. Martin L. Pipes* and *Messrs. Dolph, Mallory, Simon & Gearin,* with oral arguments by *Mr. Joseph Simon* and *Mr. Pipes.*

JOHNS, J.—1–3. In his motions to affirm the decree of the Circuit Court, the defendant relies upon the decisions of the Supreme Court of the United States, and some other jurisdictions, and the cases of *Guthrie* v. *Imbrie,* 12 Or. 182 (6 Pac. 664, 53 Am. Rep. 331), and *Putman* v. *Southern Pacific Co.,* 21 Or. 230 (27 Pac. 1033), and under such authorities contends that the disagreement of this court would necessarily result in an affirmance of the decree of the lower court.

All of the arguments in this case were heard *in banc,* and Chapter 167 of the Laws of 1913, page 295, provides:

"When sitting *in banc,* the concurrence of four justices shall be necessary to pronounce a judgment."

Section 5 of this act is as follows:

"The Supreme Court shall have power to make and enforce all rules necessary to the prompt and orderly dispatch of the business of the court, and the remanding of causes to the court below."

It is not claimed that this court ever rendered any decision in this case, and the rehearings were ordered on the application of one of the litigants.

This is a suit in equity and is here tried *de novo.* The cases of *Guthrie* v. *Imbrie,* 12 Or. 182 (6 Pac. 664, 53 Am. Rep. 331), and *Putman* v. *Southern Pacific Co.,* 21 Or. 230 (27 Pac. 1033), were both actions at law and both were decided under an older statute, different from the one enacted in 1913, above quoted, and for such reason those cases are not in point. The motions to affirm were filed on June 7, 1917, and May 2, 1918, renewed on October 21, 1918, and insisted upon at the last argument of this cause. The petitions for reargument were addressed to the sound discretion of this court and were granted in the exercise of that discretion. The following entry appears in the official records of this court under date of June 19, 1917:

"Now at this time the court being fully advised it is ordered that the motion to affirm the decree of the court below be and the same is denied."

By order of the court the case was reargued on September 4, 1917, and again reargued on November 26, 1918. This is an important case and it is very apparent that the rearguments were ordered and made for

the purpose of procuring the concurrence of four jus-
tices, "necessary to pronounce a judgment" on the
merits.    The motions to affirm the decree are denied.

At the time of their marriage, youth and energy
were about the only assets of George T. Myers and
Sally S. Myers.    They had their trials and struggles,
but through economy and close attention to business
affairs they eventually accumulated a substantial for-
tune and at the time of her death on January 18, 1902,
Sally S. Myers left an estate in her own right of the
appraised value of $26,350; and at the time of his
death on July 12, 1907, George T. Myers left an estate
of the appraised value of $232,138.65, including the
property which he received by the will of his deceased
wife.    It appears that Mrs. Myers had received $5,000
from an estate; that this money was invested and used
for family purposes; that in a large measure it was
the beginning of their later financial success and that
at the time of George T. Myers' death one parcel of
his wife's property was worth at least $100,000.
There has since been a very marked increase in the
value of all of the property.

George T. Myers and Sally S. Myers had two chil-
dren a daughter and a son, the plaintiff and the de-
fendant in this suit.    Their domestic relations were
exceptionally happy and pleasant.    Mr. Myers had
great confidence in and respect for the ability and
judgment of his wife and freely consulted her about
all of his business affairs, never making an investment
without her approval.    There was also a strong
attachment between the son and daughter and the
only trouble they ever had, originated in the execu-
tion of their father's subsequent wills and the settle-
ment of his estate.    The father and mother were boon
companions and after they had acquired their fortune

they took numerous trips, always together, and looked forward to them with pleasure. In short, up to the time when this trouble arose·it was an unusually happy family, strongly bound by the ties of love, mutual respect and confidence.

In February, 1896, just prior to taking one of their accustomed trips, George T. Myers called at the office of Whitney L. Boise, an attorney of this court, and, according to Mr. Boise's testimony, advised the latter that:

"Mrs. Myers and himself had decided to make a will, each one wanted to make a will—that he was going to will to Mrs. Myers all of his property and in case of her death before his, that he wanted it to go to his children equally, but at the present time he did not desire to give anything to the children; that Mrs. Myers had helped him to make his money and he thought that he wanted to give everything he had to her, and that she felt the same way."

Mr. Boise further testifies that both Mr. and Mrs. Myers came into his office the next morning; that, "They both stated to me what they wanted," and that, "I asked Mrs. Myers if she wanted the same kind of a will made and she said she did." They then commenced to talk about trips they had made and of the one which they were contemplating and when Mr. Boise was ready to draw the wills his stenographer had gone. He explained to them how the wills should be executed and that Mr. Myers could come in later, take them home and have them executed. He further testifies:

"I drew the wills that afternoon and Mr. Myers came in and got them and took them home and had them executed, and brought them back to my office, and I looked them over and saw they were properly ·executed ·and put them in envelopes and sealed them

up and put them in the safe in my office. They re-
mained there a great many years, I think until Mrs.
Myers' death.''

In response to a question as to any understanding
or agreement, Mr. Boise answered:

''I think I have substantially stated it, he said they
had talked it over and they had come to the agreement
to make these wills. He wanted to give all of his
property to his wife and in case she died before he
did, he wanted it to go to his children equally, and she
wanted to do the same. That is all I can recollect.

''Q. They did not ask you, as I understand it, any-
thing about the making of these wills, but told you
what they wanted done, that is, they merely told you
what they wanted in the wills?

''A. I have stated the case as it was, yes. And I
drew it as they told me to, or tried to.''

We quote from his cross-examination:

''Q. You are sure now, you did draw the wills ac-
cording to the directions of both of them?

''A. I drew the wills as I understood to be their
directions.

''Q. And the wills as they now are written express
the agreement that was made at the time between Mr.
and Mrs. Myers?

''A. That is what I tried to do, if I failed it is my
fault.

''Q. You do not wish to be understood to say that
the wills are not according to the agreement made
between them, that you have testified about?

''A. Certainly not.''

In the former case, that of contesting the will, Mr.
Boise had testified as follows:

''She left all her property to him and he left all his
to her. That is, in case either one should die, that
was the condition, and he was appointed executor of
her will and I think she was appointed executrix of

his will, and they were identical. I don't remember now as to whether in case both of them died the property was to be divided equally between the children, but her will will show. Whatever her will is, his will was a counterpart of it.''

There is no question about the execution of the will of Mrs. Myers on February 11, 1896, and while the defendant denies the execution of the will of George T. Myers of that date and such will was not offered in evidence and is not accounted for, we think it clearly appears from the record that both the husband and wife did execute their respective wills at the same time and in the same manner, as indicated by the testimony of Mr. Boise and the subscribing witnesses, and that such wills were in form and substance as outlined in the statement of this case.

4, 5. From an analysis of those wills it clearly appears that Sally S. Myers devised and bequeathed all of her property, both real and personal, to her husband, George T. Myers; that he devised and bequeathed all of his property to his wife, Sally S. Myers, and that each appointed the other as executor or executrix of the respective wills. The second clause of the wills provides:

''I intentionally omit giving anything to my children, Georgia Frances Stevens and George Tobias Myers, Jr., knowing that my husband (or my wife) will care and provide for them.''

The third clause specifically provides that in case of the death of George T. Myers before Sally S. Myers, or of Sally S. Myers before George T. Myers, ''then, and in that event, I give, devise and bequeath all of my property and estate, real and personal, of every name, nature and description, and wheresoever

situate and being, to my said children, Georgia Frances Stevens and George Tobias Myers, Jr." And in such an event the fifth clause provides for the appointment of the plaintiff and the defendant as executrix and executor of the wills. Clause 1 must be construed as an absolute devise and bequest of all of the property from the testator to the survivor, and clause 3 must be understood as showing the purpose and intent, at that time, of both George T. Myers and Sally S. Myers that when both of them should die, the son and daughter should have all of the property of their father and mother.

It is contended by the plaintiff that the wills are mutual or reciprocal and that upon the death of Sally S. Myers and the probate of her will and the taking of her property by her surviving husband under clause 1 thereof, by virtue of the agreement the will of George T. Myers then and thereby became irrevocable and that the rights of the plaintiff and the defendant then became vested under clause 3 of his will. The plaintiff further contends that the mere execution of the respective wills at the same time and in the same manner, coupled with the fact that Sally S. Myers died first and her husband probated her will and received her property thereunder, is sufficient evidence of a contract, compact or agreement to make the will of George T. Myers of February 11, 1896, irrevocable; that if such acts and facts are not legally effective for that purpose, the oral testimony in the record, considered with the execution of such wills, is sufficient evidence to establish the existence of the alleged compact or agreement, and that it can be enforced by this plaintiff as the daughter and one of the beneficiaries under the third clause of the wills.

91 Or.—9

This is not a case where both parties before marriage had their own property and made an antenuptial contract. Neither is it a case where, by inheritance or otherwise, both of them acquired property after marriage and then made mutual wills. Nor is it an instance where one of the parties by his individual efforts only had acquired property and the other had obtained none. But it is a case where at the time of their marriage neither the husband nor the wife had any property, and as the result of their mutual and joint endeavor after their marriage they accumulated a substantial fortune under a law which gives the wife equal property rights with her husband; and where a husband and wife, at the same time, in the same manner, in the presence of the same witnesses, with the same terms and provisions and for the same reasons executed their respective wills. It must be conceded that the wills in question clearly expressed the natural feeling and instincts which then existed between a loving husband and a devoted wife and those strong parental ties which bind father and mother to son and daughter; that such wills were the very natural expression of the true relation which then existed between the members of the family; that the father then fully intended that the son and daughter should eventually receive, share and share alike, all of the property of both the father and the mother; that such relations continued to exist until some time after the death of the mother on January 13, 1902; and it must be fair to assume that the mother died fully trusting and believing that such relations would continue to exist; that the terms and provisions of the wills of herself and her husband which were executed on February 11, 1896, would be fully carried out and that upon the death of her husband the son and daughter

would then receive in equal parts all of the property which had been accumulated by the mutual efforts of herself and her husband. The surviving husband probated her will, took and accepted the use and benefit of her property and claimed it as his own, with full knowledge of the terms and provisions of her will and the terms and provisions of his own will concurrently executed on February 11, 1896.

Standing alone, are such circumstances sufficient evidence of a valid contract between husband and wife, and can such contract now be enforced by the daughter as against the defendant, who claims title to all of the property under the terms and provisions of the father's will executed on May 31, 1902, after the death of the latter's wife and the receipt by him of her property under her will of February 11, 1896? This presents a novel and interesting legal question, upon which there is an apparent conflict of the authorities. The leading original case on this subject is *Dufour* v. *Pereira,* Volume 1, Dickens' Reports, page 419, decided by Lord CAMDEN, Chancellor, on July 18, 1769, wherein:

"Camilla Rancer, the wife of —— Rancer, being entitled to a legacy under the will of her aunt: she and her husband agree to make a mutual will, which they do, and both execute it. The husband died; the wife proved his will, and afterwards made another will. And the question was, whether it was in the power of the wife to revoke the mutual will."

The will was jointly executed by them. The Chancellor said:

"Consider how far the mutual will is binding, and whether the accepting of the legacies under it by the survivor, is not a confirmation of it.

"I am of opinion it is.

"It might have been revoked by both jointly; it might have been revoked separately, provided the party intending it had given notice to the other of such revocation.

"But I cannot be of opinion that either of them could, during their joint lives, do it secretly; or that after the death of either, it could be done by the survivor by another will.

"It is a contract between the parties, which cannot be rescinded but by the consent of both. The first that dies, carries his part of the contract into execution. Will the Court afterwards permit the other to break the contract? Certainly not.

"The defendant Camilla Rancer hath taken the benefit of the bequest in her favor by the mutual will; and hath proved it as such; she hath thereby certainly confirmed it; and therefore I am of opinion, the last will of the wife, so far as it breaks in upon the mutual will, is void."

For such reasons it was held that by her acts the defendant "bound her assets to make good all her bequests in the said mutual will" and it was ordered that an accounting be had. This case is criticised and somewhat weakened by the later decision of Lord Loughborough in the case of *Lord Walpole* v. *Lord Orford,* 3 Ves. 102, but is again approved in *Stone* v. *Hoskins,* Volume 93, N. S. Law Times Reports, 441, decided in November, 1905.

Underhill on the Law of Wills, Volume 1, page 19, Section 13, lays down this rule:

"Mutual wills, whether joint or several, are revocable by either testator during the life time of the others so far as his disposition of property is concerned, without notice to or consent of the others, unless the making of the will is the result of a contract by which each has agreed to devise his property to the others.

"If two testators who have united in the execution of a mutual will have devised their property to each other so that the devises form a mutual consideration, neither, after the death of the other and the probate of the will as to *his property,* is at liberty, after accepting the benefit conferred, to repudiate the contract to the injury of the heirs or next of kin of the testator who predeceased him.  The mutual will was made upon condition that the whole shall be but one transaction.  If the will is not revoked during the joint lives of the testators, he who dies first has a right to rely upon the promise of the survivor.  He has fulfilled *his part* of the agreement, and it is not just to his representatives to permit a revocation when he has been prevented from revoking his will by a reliance upon the other's promise.  It is too late for the survivor, after receiving the benefit, to change his mind because the first will is then irrevocable.  It would have been differently framed, or perhaps not made at all, if it had not been for his inducement"— citing, among other authorities, the case of *Dufour* v. *Pereira,* Vol. 1, Dickens' Reports, 419.

Schouler on Wills (5 ed.), Volume 1, page 577, Section 458a, says:

"It would appear that at all events, either party to a joint or mutual will, and a survivor especially, has the right during life to revoke that will as concerns his own disposition, so that it cannot be set up in probate as his last testament; but that in equity, at all events, a subsequent revocation which was not mutual cannot destroy the trust or compact created thereby."

A full discussion of this question is found in the late work of Alexander on Wills, where in Volume 1, Sections 85, 87, 88 and 91, pages 96–105, the author says:

"The general rule seems to be, although not undisputed, that if two persons execute wills at the same time, either in one or two instruments, making reciprocal dispositions in favor of each other, the mere

execution of such wills does not impose such a legal obligation as will prevent revocation, without notice, by either during their joint lives. The case is different, however, where the mutual or reciprocal wills are the result of a contract based upon a valid consideration, where there has been a joining of property interests for the purpose of making a testamentary disposition of the same, or where, after the death of one, the survivor has accepted benefits under the will of the other which was executed pursuant to an agreement. In such cases, where all the facts are fully established, equity will interpose to prevent fraud. This, however, can be accomplished only through a court of equity, the probate court having no jurisdiction. * *

"There are cases, however, where it would be a fraud for the survivor of two who had, pursuant to an agreement, made wills in favor of each other and certain third persons, to alter or revoke on his part the testamentary dispositions so mutually made, after the will of the other had become irrevocable through death. In such a case equity will step in to prevent fraud and will compel performance, viewing the matter as a contract rather than as a will. * *

"Where two parties have made mutual wills in favor of each other, whether pursuant to a valid agreement or not, if the survivor receives benefits under the will of the other who has died without having revoked the same and under the belief that the will of the survivor would not be altered, the revocation by the survivor of his will would be such a fraud as equity would prevent. Such wills are in effect the separate will of each maker and the right of revocation is undisputed except in those cases where it would be a fraud against the estate of the decedent to allow the survivor to receive a benefit or advantage under the will of the one first dying and thereafter to make a different disposition of his property. Where mutual or reciprocal wills have been made pursuant to an agreement which has been executed by one of the testators dying without having made any different testamentary disposition of this property, and the other

has accepted the benefits accruing to him under the
will of the deceased, the agreement becomes obligatory
upon the survivor and may be enforced in equity
against his estate.

"The distinguishing feature of a will is that the tes-
tator may revoke it at any time, yet this right may be
renounced. He may contract to make a will contain-
ing certain dispositions which shall not be altered or
canceled, and such agreement, if based upon a suffi-
cient consideration, is valid and will be enforced in
equity.* * "

The case of *Anderson* v. *Anderson* (Iowa), 164
N. W. 1042, holds:

"While extrinsic evidence is inadmissible to vary
or change the terms of a will or make another or dif-
ferent will for the testator, there is no rule excluding
proof of facts tending to show that a husband and wife
who executed wills in favor of each other within a few
weeks of each other acted with the knowledge of the
other, that the wills were drawn by the same person at
the same time and in identical terms and at the joint
request or direction of both husband and wife, and
that they were in fact executed in pursuance of a
common understanding and purpose.

"Evidence *held* to show that wills executed by a
husband and his wife in favor of each other, though
executed on different dates, were executed in pursu-
ance of a common understanding and purpose, even
excluding the testimony of the scrivener as to the
statements of the parties to him concerning the con-
tents of the wills and their intention therein ex-
pressed."

From an examination of that case it will be found
that there is a marked similarity between the testi-
mony of J. E. Anderson, who prepared the wills in
question there, and that of Mr. Boise in the instant
case. In its opinion the court goes on to say:

"But we think there is no rule of evidence which excludes proof of facts tending to show that the husband and wife did act each with the knowledge of the other; that the two wills were drawn by the same person at the same time, and in identical terms, and at the joint request or direction of both husband and wife; and that although the dates of their execution differ by a few days they were in fact executed in pursuance of a common understanding and purpose."

In the case of *Frazier* v. *Patterson,* 243 Ill. 80 (90 N. E. 216, 17 Ann. Cas. 1003, 27 L. R. A. (N. S.) 508), the syllabus in the last-named report says:

"A will executed jointly by husband and wife, in which each devises his or her property to the other for life with remainder over, cannot be revoked by one after the death of the other.

"Extraneous proof of mutual understanding is not necessary to make irrevocable, after the death of one party, a joint will by husband and wife, by which each gives his or her property to the other for life with remainder over to their child."

And at the close of the opinion the court says:

"If evidence of a mutual compact is necessary in such case, that evidence is afforded by what the parties did. We cannot see how the situation would be any different if witnesses had testified that they heard this husband and wife discuss what disposition they would make of their respective estates, and that they agreed with each other that they would make a joint will such as they did make. The fact that they made such will is satisfactory proof to our minds that it was done in accordance with their mutual compact to dispose of their property in this manner."

We find this statement in the notes appended to the above report of the case:

"There is much confusion and apparent conflict among the cases upon the question of the revocability

of a mutual or conjoint will by one of the makers after the death, or without the consent, of the other. The general principle, however, seems to be that such an instrument, as a testamentary instrument, may be revoked by either maker, so far as his property is concerned, without the consent of the other, and therefore an express or implied covenant against revocation will not prevent the probate of a later will executed by one of the parties; but a court of equity may in a proper case give effect to the instrument as a contract, in the same way that equity may give practical effect to an agreement to make, or not revoke, an individual will. This distinction serves in a large measure to reconcile apparently conflicting cases.''

The case of *Brown* v. *Webster,* 90 Neb. 591 (134 N. W. 185, 37 L. R. A. (N. S.) 1196), in the syllabus lays down this rule:

''Where a husband and wife, possessed of separate estates, orally agree that upon the predecease of either the survivor shall thereupon become the owner of all of the estate, both real and personal, of such decedent, and at the same time, and in pursuance thereof, and for the expressed purpose of providing a proper method of carrying such agreement into effect, simultaneously execute reciprocal wills, in each of which the other spouse is made sole devisee and legatee, *held* that the oral agreement and the execution of the wills constitute a single transaction, that each is an integral part of one contract, and that such contract cannot be said to rest entirely in parol.

''And, in such a case, the contract of each is a sufficient consideration for the contract of the other.

''And the continued reliance by plaintiff upon the contract, by permitting her will executed as a part thereof to remain in the family safe, unchanged and unrevoked, during the entire lifetime of the deceased, constituted full performance by her of the terms of the contract.

''And the wills, executed as a part of such contract, in equity, are not ambulatory, and may not be revoked

by either party to such contract so long as the other party continues to perform the contract on his or her part."

*Larrabee* v. *Porter* (Tex. Civ. App.), 166 S. W. 395, is an exhaustive and well-considered case, and the rule is there stated thus:

"A joint and mutual will, executed by husband and wife pursuant to a contract between them, which gives to the survivor a life estate in the entire property with remainder to their daughters, is executed on a valid consideration consisting of the reciprocal devise of the one to the other, and where on the death of the wife, acquiescing in the will, the husband probates it and goes into possession, he cannot revoke the will.

"Where a joint and mutual will executed by husband and wife, which gave to the survivor their property for life with remainder to their daughters, was executed in consummation of a parol agreement between them to make an equitable disposition of their property to their children, and the husband, on the death of the wife, probated the will and took possession of the property devised thereby, he was estopped from thereafter disregarding the will."

In *Robinson* v. *Mandell*, 20 Fed. Cas., page 1027, the rule is thus laid down:

"Where two persons agree each with the other to make mutual wills, and both execute the agreement, it is held that neither can properly revoke his will without giving notice to the other of such revocation. The death of one of the parties in such a case carries his part of the contract into execution, and the better opinion perhaps is, that the other party, after that event, if the agreement was definite, and satisfactory, cannot rescind the contract: *Dufour* v. *Pereira,* 1 Dickens, 419; 2 Harg. Jurid. Arg. 272. * * The doctrine is, that the parties are under a restriction, each to the other, not to revoke their respective wills so as to secure any undue advantage. Bound by the agreement to maintain good faith, each to the other, the con-

clusion is, that neither can revoke without giving due and seasonable notice."

2 Story's Equity Jurisprudence, Section 785, says:

"A contract to make mutual wills, if one of the parties has died having made a will according to the agreement, will be decreed in equity to be specifically executed by the surviving party if he has enjoyed the benefit of the will of the other party."

In *Prince* v. *Prince,* 64 Wash. 552 (117 Pac. 255), it is held:

"Mutual wills by two testators, looking to a just distribution of the property of both, partake of the nature of contracts, and may be specifically enforced."

This case quotes with approval the opinion in *Deseumeur* v. *Rondel,* 76 N. J. Eq. 394 (74 Atl. 703), where the rule is thus laid down:

"A contract of two persons on a sufficient consideration for the benefit of a third person is enforceable against the contractor."

And:

"An agreement between two persons on a legal consideration to dispose of their property at death in a specified manner, or to specified persons, is enforceable. * *

"It may be that during the lifetime of both Alexander and Elizabeth Bisson either could have rescinded this agreement—call it a will, or call it a contract, or an instrument of proof tending to prove a contract. But I am clearly of opinion that whatever name should be properly used to characterize this paper, it proves, or tends to prove, an agreement between the parties signing it to dispose of their property in a certain way which a court will enforce if made upon legal consideration, and if it be true and proven that at the time the paper was executed, and at the time of the death of Alexander he was possessed of personal property or real estate which was

taken over and used by Elizabeth, his wife, by virtue of the probate of this paper as his will, the agreement thus evidenced has sufficient legal consideration to support it, and the rights under it will be enforced.

"If, for instance, Alexander was a man of means, and Elizabeth had the four lots which were in her name at the time of the making of the paper on the 20th of June, 1855, and they made this paper, which, as they said was to make a final settlement respecting their properties, and he died first, and she took under the terms of this paper which was probated as a will all of his personal property, and either used it (if it were held that under the terms of the probated will she was entitled to do so), or used it for life (if the narrower estate was held to be vested), I cannot believe it possible that any court would thereafter permit her, under these circumstances, to rescind or repudiate her part of the bargain."

In *Campbell* v. *Dunkelberger,* 172 Iowa, 385 (153 N. W. 56), this doctrine is announced:

"Where mutual wills, reciprocal in their provisions are executed in pursuance of a contract between the parties, if after the death of one of the parties the survivor takes advantage or accepts the provisions made by the other party, the survivor may not otherwise dispose of his property than according to the terms of the will."

In the case of *Baker* v. *Syfritt,* 147 Iowa, 49 (125 N. W. 998), it is held:

"Where two persons unite in a joint will, whereby the survivor takes some benefit from the estate of the one first dying, and such provision is coupled with another, by which, subject to such right in the survivor, the estate of both is devised to a third person, there is an element of contract obligation between the persons, and when the devise becomes irrevocable, there arises a vested right in the beneficiary of which he cannot be arbitrarily deprived."

In *Rastetter et al.* v. *Hoenninger et al.*, 151 App. Div. 853 (136 N. Y. Supp. 961), Id., 157 App. Div. 553 (142 N. Y. Supp. 962), Id., 214 N. Y. 66 (108 N. E. 210), this rule is announced:

"Where a joint and mutual will is made by a husband and wife and is binding upon the survivor, the latter by proving the will and accepting benefits thereunder contracts that not only the property received from the estate, but also his individual property, shall be disposed of at his death in the manner provided by the joint will."

This case is cited and approved in the recent opinion in *Phillip* v. *Phillip*, 96 Misc. Rep. 471 (160 N. Y. Supp. 624).

In the case of *In re Burke's Estate*, 66 Or. 252 (134 Pac. 11), in an opinion written by Mr. Chief Justice McBRIDE, quoting with approval from 40 Cyc. 2117, 2118, it is said:

"Such an agreement is valid if performed by the making of such wills and the acceptance by the surviving party of the fruits of the agreement, but it is valid only as a contract, the performance of which by one party and acceptance by the other has taken it out of the statute of frauds."

The above authorities, either directly or by implication, sustain the legal principles contended for by the plaintiff.

In 1 Alexander on Wills, Section 85, it is said:

"The weight of authority is that such agreements to make wills are not established merely because two persons have made reciprocal testamentary dispositions in favor of each other, the language of such wills containing nothing to the effect that the instruments were the result of a contract. Some jurisdictions, however, have held that such fact causes the presumption to arise that the wills were executed pursuant to

an agreement. The reasoning in such cases, however, does not seem cogent and general facts and circumstances are included to aid in arriving at the conclusion. * * And where such wills are executed by relatives because of love, affection or family ties, such facts would seem to negative any agreement between the parties based upon a fixed condition.''

In the recent case of *Wanger v. Marr,* 257 Mo. 482 (165 S. W. 1027), the Supreme Court of Missouri in legal effect overrules the former case of *Bower v. Daniel,* 198 Mo. 325 (95 S. W. 359), and holds that:

''The mere fact of the execution of joint wills is not sufficient in itself to show that the wills were made pursuant to contract. * * The reciprocal character of separate wills, if proved, is not so significant evidence that they were executed pursuant to a contract as is the execution in a single instance of the joint will of husband and wife,'' and that the evidence in the case was ''insufficient to establish the fact that contemporaneous wills executed by the husband and wife were executed pursuant to a contract.''

In *Allen v. Bromberg,* 163 Ala. 620 (50 South. 884), it is held that:

''Where there was an agreement between husband and wife to make mutual wills disposing of real estate, the same was void unless in writing, and the wife had the right to revoke a will made pursuant thereof, after the death of the husband, and to make another.''

In *Edwall v. Jesseph,* 75 Wash. 391 (134 Pac. 1041), it is announced:

''The making of mutual wills by a husband and wife is not such part performance of an oral contract to make irrevocable wills, devising the real estate of the parties to the survivor, as to take the same out of the operation of the statute of frauds.''

In *Buchanan v. Anderson,* 70 S. C. 454 (50 S. E. 12), this statement is made:

"Where a husband and wife adopt an instrument as their will which disposes of the separate but not of the joint, property, either may revoke it, in the absence of a valuable consideration to support a contract to dispose of the property in the manner set forth in the will."

*Wilson* v. *Gordon,* 73 S. C. 160 (53 S. E. 79), decided that where:

"An attorney was employed by two maiden sisters on joint request to prepare two wills, giving the property of each to the other, with a provision that, if the devisee should die in the lifetime of the testator, the property should go to a niece and her children. *Held* not mutual wills, and that the surviving sister after having accepted the benefit of the deceased sister's will, might destroy her own will."

In *Cawley's Appeal,* 136 Pa. 628 (20 Atl. 567, 10 L. R. A. 93), it was decided that:

"The instrument was not a contract, in form or effect; nor, there having been no joint property or joint devise, was it a joint will. It was properly a double will, and must be construed and treated as the separate will of each maker, as fully as though a separate copy had been executed by each. Wherefore, after the death of one, it was revocable by the other as to his own property."

In *Edson* v. *Parsons,* 155 N. Y. 555 (50 N. E. 265), it is held that:

"After the death of one of the sisters, the survivor made a different will and upon her death the brother attempted to establish the provisions of the first will as a contract between the sisters to give their property ultimately to the brother. *Held,* that the making of the wills, and the other circumstances shown, did not establish such a contract, as a matter of law."

The opinion goes on to say:

"I think it needs no further argument to show that to attribute to a will the quality of irrevocability demands the most indisputable evidence of the agreement which is relied upon to change its ambulatory nature, and that presumptions will not, and should not, take the place of proof."

This case was cited with approval by Mr. Justice EAKIN in *Sappingfield* v. *King*, 49 Or. 109 (89 Pac. 142, 90 Pac. 150, 8 L. R. A. (N. S.) 1066).

Such is the conflict of authorities as shown by the decisions of some of the different courts. Applying the law to the facts in the case at bar we find that in the preamble of their respective wills each testator says: " * * hereby revoking all former wills made by me." This language would clearly imply that each of them had made a former will and from it we might infer that their former wills were mutually revoked; that in consideration thereof the instant wills were executed and that circumstance might be a consideration for such wills. Concerning the conversation prior to the execution of the wills, Mr. Boise testifies that George T. Myers told him, "At the present time he did not desire to give anything to the children," and in clause 2 of their respective wills the testators announce their intentional omission of any bequest to their children, "knowing that my wife (or my husband) will care and provide for them." We consider this to mean that it was not the purpose or intent of either of the testators specifically to bequeath any property to either of the children while both of the parents were living, and that each of them relied upon the other, after the death of one and during the lifetime of the survivor, properly to care and provide for them, and what should be proper care and provi-

sion was a matter in the discretion of the surviving parent. That is the construction which should be placed on clause 2 of the will. Any specific provision for the children must then be found in the third clause. If both wills remained in force and effect as they were originally executed, upon the death of their parents the children would become the owners of their joint estate, share and share alike.

The testimony is undisputed that the mother, Sally S. Myers, was a shrewd, practical business woman of far more than ordinary ability. This appears from the uncontradicted testimony of Dr. Darr, H. L. Pittock, Mrs. H. L. Pittock and Captain John Marshall. Her husband considered her, as he told one witness, "the main spoke in the wheel, in the business way and every other way," and said that "if it had not been for Mrs. Myers, he would not be where he was." Another witness says:

"He consulted with her about their business affairs. * * He always told me she was the best partner he ever had."

To the witness C. C. Smith, Mr. Myers said:

"The balance of my property I want to keep for my children."

The record shows that Mrs. Myers had all of the loving instincts of a good wife and mother; that she was very much concerned in the success and happiness of her children and that the plaintiff in particular was a constant companion of, and devoted to, her mother, to the very last. We cannot believe that it was ever the purpose or intent of the mother to put it in the power of the father, after he should acquire her property under her will, to disinherit her daughter, and yet that is the legal force and effect of the contention of the defendant.

The testimony is undisputed that their fortune was acquired as the result of the joint and mutual efforts of the father and mother; that each of them recognized that fact; that the mother was freely consulted by her husband on all matters and that her advice was followed in all their business dealings. It must be conceded that at the time of the execution of their respective wills on February 11, 1896, it was then the expressed intention of both of them that when the father and mother should die, the children should then have all of their joint accumulations; that when the mother died both of their wills were in force; and that she died "knowing" that during the lifetime of her husband he would properly provide for the children and that upon his death they would receive, and become the owners of, the joint property of herself and her husband under clause 3 of their respective wills.

The record shows that the plaintiff has been the victim of unfortunate circumstances, as the result of which her father, immediately upon the death of his wife, her mother, sought to disinherit her and made a new will, in which he left her a nominal sum only; that after about four months, upon his return from California, he made another will, in which he bequeathed to his daughter $20,000 when she should arrive at the age of forty-five years, and devised all of his other property to the defendant; and that for the purpose of further cutting off his daughter he afterwards executed a codicil which provided that in the event of the death of his son before his own death, he bequeathed $20,000 to the Portland Children's Home, $20,000 to the Taylor Street Methodist Episcopal Church of Portland, $20,000 to his nephew, Charles A. M. Myers, and the residue of his estate to

other named nephews and nieces. At the time the later will was prepared he told Mr. Boise that, ''he had been thinking it over himself, and he thought he ought to give Mrs. Stevens half the value of the property he got from his wife,'' and it was apparently for that purpose that he devised to her the $20,000 to be paid when she should reach the age of forty-five years. Yet it appears from the testimony of the defendant himself that at the time of his father's death one parcel of the property which the latter had received from his wife was worth at least $100,000, and the plaintiff's husband testifies that it was worth $150,000.

6, 7. After again reading the testimony, carefully studying and examining the respective wills and re-reading all of the authorities, and upon a further consideration of all of the surrounding facts and circumstances which obtained at the time the wills were executed, we are of the opinion that the wills in question were executed pursuant to an agreement and understanding between the deceased George T. Myers and Sally S. Myers; that there was a valid and mutual consideration for such agreement and that in equity and good conscience the agreement should be enforced. This does not conflict with the right of any individual to dispose of his own property, by will or otherwise, in his own discretion, but we do hold that where for a good consideration two persons enter into an agreement to execute mutual wills and do execute such wills pursuant to such agreement, and one of them dies while both of such wills are in force and effect, the survivor probating the will of the deceased and accepting property under it; and where the agreement is valid and reasonable and such facts are established by competent evidence, that a court of equity will then

enforce the specific performance of such agreement
on behalf of a third person who is a beneficiary under
such mutual wills.  In this case we hold that there is
sufficient evidence of such an agreement and of a valid
consideration between George T. Myers and Sally S.
Myers at the time of the execution of their respective
wills; that after George T. Myers acquired his wife's
property by a mutual will under a contract, equity
will not permit him to keep the property and revoke
the contract; that the plaintiff as a beneficiary under
clause 3 of their mutual wills is entitled to a specific
performance of that agreement; that she is the owner
of and should have an undivided one-half interest in
all of the property, both real and personal, of which
her father died seised and which he owned at the time
of his death, and that she should have from the de-
fendant an accounting therefor.

The decree of the Circuit Court is reversed and it is
hereby ordered, adjudged and decreed that the plain-
tiff is the owner of and is entitled to have and receive
an undivided one-half interest in all of the property,
both real and personal, owned and held by George T.
Myers, her father, at the time of his death on July 12,
1907; that she is entitled to an accounting for any
and all of the rents, issues and profits of such prop-
erty from that date; that the defendant is entitled to
credit for any just and reasonable charges or expenses
incurred in the administration of the estate, including
the contest of the will of George T. Myers, but that
he is not entitled to credit for any expenses or attor-
neys' fees incurred in the defense of this suit; that
such decree shall be and is hereby entered; that for
the purpose of such an accounting the cause shall be
remanded to the Circuit Court, and that neither party,

shall have or recover costs on this appeal or in the
court below.

REVERSED.   DECREE RENDERED, WITH REMAND FOR AN
    ACCOUNTING.   REHEARING DENIED.

MR. JUSTICE HARRIS took no part in the considera-
tion of this cause.

MR. JUSTICE BEAN concurs in the result of this
opinion.

BURNETT, J., Dissenting.—The plaintiff sues to
enforce the specific performance of an alleged con-
tract said to have been made between her parents,
which she thus states in her complaint:

"That while each of her parents was so the owner
of such property, her father promised and agreed with
her mother that for and upon the consideration that
her mother would make and execute a will whereby
she would devise and bequeath to him all the property
of every kind which she might own at the time of her
death and would further provide in and by said will
that in the event that he should die before her mother
then all of the property of every kind which her
mother might own at the time of her death should be
equally divided between the plaintiff and the defend-
ant herein, her father would make and execute a will
whereby he would devise and bequeath to her mother
all the property of every kind which he might own or
in which he might have an interest at the time of his
death and that in and by said will he would further
provide that if her mother should die before he did
then and in that event all the property which he might
own or in which he might have an interest at the time
of his death should be equally divided between the
plaintiff and the defendant herein.   That her mother
joined in said agreement so to make and execute said

wills and promised and agreed with her father to make and execute a will as aforesaid.''

She avers in substance that on February 11, 1896, each of her parents, in pursuance of that agreement, made a will which she sets out at large in her complaint. These testamentary documents are averred to be alike except that the testator and the principal beneficiary are transposed. Quoting from the will of the mother, the following three clauses appear:

''I.

''I give, devise and bequeath all of my property and estate, real and personal, of every name, nature and description, and wheresoever situate or being, to my beloved husband, George T. Myers, to have, possess and hold the same in his own right.

''II.

''I intentionally omit giving anything to my children, Georgia Frances Stevens and George Tobias Myers, Jr., knowing that my husband will care and provide for them.

''III.

''In case of the death of my said husband, George T. Myers, before my death, then and in that event, I give, devise and bequeath all of my property and estate, real and personal, of every name, nature or description, and wheresoever situate and being, to my said children, Georgia Frances Stevens and George Tobias Myers, Jr.''

The complaint also states in substance that without either of the wills being changed, the mother died on January 18, 1902, and the father took all her property under her will and afterwards made a different will bequeathing to the plaintiff only $20,000 out of his possessions said to have been of much greater value and giving the rest to the defendant, plaintiff's brother. It is charged that under the last-mentioned will the defendant took possession of the estate of the

father after the latter's death, including what came
from the mother, and has managed the same with
great profit, the exact amount of which is unknown to
plaintiff but she calls for an accounting and demands
a specific performance of the alleged agreement so
that half of the estate and its increment shall be de-
creed to her. It is affirmatively stated in the com-
plaint:

"That the promises, agreements and contracts be-
tween the father and mother of the plaintiff, as here-
inbefore alleged and set out, were not in writing, and
that the plaintiff does not know, and therefore cannot
allege, the exact date upon which the same were made,
but according to her best knowledge and belief they
were so made on, or a short time before, the 11th day
of February, 1896."

A general demurrer to the complaint was over-
ruled. The agreement and the making of the wills in
pursuance thereof, as stated by the plaintiff, are
denied by the answer.

As an estoppel against the maintenance of this suit,
the defendant avers the probate of the will under
which he claims and its final establishment over the
plaintiff's contest thereof as decided in *Stevens* v.
*Myers,* 62 Or. 372 (121 Pac. 434, 126 Pac. 29). The
reply traverses the answer in material particulars.
From a decree dismissing her suit the plaintiff
appeals.

It is conceded as a matter of law that it is compe-
tent for living persons validly to contract with each
other to make a certain testamentary disposition of
the property of either or both. The authorities, how-
ever, differ somewhat as to the effect of such a con-
tract, some of them distinguishing between devises
solely to the other contracting party and those to him

and others. For instance, in *Anderson* v. *Anderson* (Iowa), 164 N. W. 1042, cited by the plaintiff and in the opinion of Mr. Justice JOHNS, the husband and wife each made a will naming the other as sole beneficiary thereof. As claimed in the present case, the two testaments were identical in form in all respects except in date, but they were made about the same time. The testimony of the scrivener is much like that of the one who drew the alleged wills in the present case. The precedent under consideration, however, proves too much for the contention of the present plaintiff. The court there said:

"Much of the confusion and doubt which is liable to arise over cases of this kind is readily removed if we keep in mind the essential truth that the two instruments constitute a single will and that it is in all essential respects the will of the first to die, and when such death occurs, and the will is thereby made effective, and is established in probate, such joint or mutual instrument has served its full purpose, and it has no further existence as the will of the survivor. The generality of this statement is subject to this exception, that if, as sometimes happens, the mutual character of the will is limited to a fractional part of the survivor's estate, and in the same instrument such survivor includes a bequest or devise to some third person or class of persons, then to that extent the instrument is an individual will, and to that extent may be established and carried out."

In that instance both Anderson and his wife were dead when the litigation arose, the husband dying first. The plaintiffs as heirs at law of the husband claimed under a section of the Iowa Code providing that:

"If a devisee die before the testator his heirs shall inherit the property devised to him unless from the terms of the will a contrary intent is manifest."

This is substantially like our own statute, Section 7327, L. O. L. The court, speaking through Mr. Justice WEAVER, used this language:

"Does the statute which appellants invoke have any application to this case? In our judgment it does not. By this provision which preserves to the heirs of a devisee who predeceases the testator making the devise the right to succeed thereto, a lapse is prevented. That is, if the devise is one which would have vested in the deceased devisee at some time had he lived, his heirs take his place in the same right. They take through the devisee, or (perhaps in more accurate terms), they take in his stead by way of representation or statutory substitution. But their right is not of any better or higher quality than was his. If then, as we have already indicated, the wills are to be treated as mutual and reciprocal, constituting in legal effect the will of the first to die, it follows that the reciprocal devise which would have vested in the husband had the wife died first could never become effective or payable either to the husband or his heirs. In other words, the husband's rights in the estate of his wife were by the will made to depend solely upon his surviving her. He did not survive her, and the will she had made in his favor, conditioned upon his outliving her, can never be made effective for any purpose at the demand of his heirs. This is the logical and necessary result of the most recent holdings on this branch of the law of wills. (Citing a large number of authorities.) While these cases are not all closely in point with the one at bar they do together, though with some variances, afford a fair guide to correct conclusions upon a question which is not frequently before the courts and the law upon which has not yet progressed beyond its formative period. But the present case brings it up in its simplest and least complicated form. The will as we construe it is wholly reciprocal. Each party thereto makes the other the sole beneficiary. It creates no remainders and no executory devises. The survivor is to take all

that either or both has to give, benefits which are subject to no condition or contingency save that of survivorship. As the husband died first the instrument is to be treated and given effect as his will alone, and when this is done nothing is left to operate or to be given effect as the will of the survivor.''

Applying the doctrine of the Anderson case to the present contention and conceding that the husband and wife made identical wills, they constitute but one instrument which is the will of the first to die, and only that. Having served its purpose as the testament of the first decedent, and the estate not having been limited under the conditions of the instrument to any other, the bipartite convention, even if made as alleged, served its purpose as the will of the first decedent and afterwards became inert. According to the theory of the Anderson case, therefore, on the wills as stated in the complaint Myers took as of right all of the property of his wife on her decease because she bequeathed it entirely to him, expressly omitting any bequest to the children, and there the transaction between the husband and wife ended, leaving the survivor, as in the Anderson case, to do as he chose with his estate augmented by that of his wife.

In the opinion of Mr. Justice JOHNS there is a quotation from 1 Alexander's Commentaries on Wills, to the effect that:

"Where two parties have made mutual wills in favor of each other, *whether pursuant to a valid agreement or not,* if the survivor receives benefits under the will of the other who has died without having revoked the same and under the belief that the will of the survivor would not be altered, the revocation by the survivor of his will would be such a fraud as equity would prevent."

In good reason this cannot be the law, for it would under all circumstances utterly destroy testamentary capacity and authority where one party had made a will in favor of another who had reciprocated. The authorities cited in support of the text do not uphold it but are decided on the basis that there was a precedent contract for making such wills. For instance, in *Schumaker* v. *Schmidt*, 44 Ala. 454 (4 Am. Rep. 135), there was a joint instrument containing testamentary language, as well as express words of contract upon the consideration of mutual promises, which was executed by both parties and attested as a will giving to the survivor the whole property of the first to die. Afterwards one of them made a separate will otherwise disposing of his property, and died. The survivor sought to impress upon the decedent's property a trust in accordance with the original joint agreement but his bill was dismissed. In *Bolman* v. *Overall*, 80 Ala. 451 (2 South. 624, 60 Am. Rep. 107), the court said, among other things, respecting the instrument signed by the decedent and involved in the suit:

"It is clearly a will in form, being testamentary in frame and verbiage. But it is also a contract, in essence and fact, being executed, as stated on the face of the paper, 'in consideration of past and future treatment' and as shown by the bill, in furtherance of a previous parol agreement that it should be executed upon an admitted and specified valuable consideration."

*Baker* v. *Syfritt*, 147 Iowa, 49 (125 N. W. 998), was a case concerning a joint will which the court construed as a contract and which the survivor adopted. *Campbell* v. *Dunkelberger*, 172 Iowa, 385 (153 N. W. 56), was another joint will case and the court said:

"In order that either party be denied the right to revoke such wills, it must appear by clear and satisfactory evidence or on the face of the wills that these were executed in pursuance of a contract or compact between the parties."

*Bower* v. *Daniel,* 198 Mo. 289 (95 S. W. 347), indeed holds that there must be a contract, but also decides that a joint will gave internal evidence of a supporting agreement. However, this case was expressly overruled in the later case of *Wanger* v. *Marr,* 257 Mo. 482 (165 S. W. 1027). Without exception, the precedents cited under the section of Alexander on Wills above noted are based upon contract, so that the case must turn in every instance upon the existence of an agreement and whether it is sufficiently proved to take the case out of the statute of frauds. The ambulatory element of wills is not to be destroyed unless there is a contract to that effect.

Passing this, however, we come to the main question to be determined, namely, whether Myers and his wife made the agreement stated in the complaint. The principal testimony about the execution of the wills is that of Whitney L. Boise. Referring to those wills which the plaintiff says were executed in pursuance of the alleged oral agreement, he stated:

"Shortly before these wills were drawn, perhaps three or four days, Mr. Myers called at my office. He used to come there very often, drop in every day or so, and he said they were going off on a trip, and that Mrs. Myers and himself had decided to make a will, each one wanted to make a will— * * that he was going to will to Mrs. Myers all his property, and in case of her death before his, that he wanted it to go to his children equally; but at the present time he did not desire to give anything to the children; that Mrs. Myers had helped him make his money and he thought he wanted to give everything he had to her, and that

she felt the same way. I told him if they would both
come in it would not take but a short time to draw the
wills, and they could execute them most any time. I
think it was the next morning about half-past 11 they
came in, and then they both stated to me the under-
standing again, what they wanted. Mr. Myers, I
think, was the spokesman. I asked Mrs. Myers if she
wanted the same kind of a will made, and she said she
did; and then we commenced to talk over some of their
trips. I knew them very well, socially. They told me
about some of the trips they had taken in the east, and
what they contemplated doing; and we talked for some
time, and when I got ready to draw the wills, I looked
at my watch and it was about half-past 12 o'clock, and
the stenographer had gone. I told them I would dic-
tate the wills that afternoon, and prepare them, and
Mr. Myers could come in and take them home and exe-
cute them. That they wanted to have two wit-
nesses,—I explained how they were to be executed—
that were not interested in the property. That was
all there was to it. I drew the wills that afternoon
and Mr. Myers came in and got them and took them
home and had them executed and brought them back
to my office, and I looked them over and saw they were
properly executed and put them in envelopes and
sealed them up and put them in the safe in my office.
They remained there for a great many years, I think
until Mrs. Myers' death.

''Q. Now in the talk that they had, or he had, with
you, I would like to have all that you can remember
that they said as to any understanding, agreement, or
arrangement that they had, or they would make in
that will, or wanted to make, or talked over to them-
selves, anything of that sort. All the conversation as
you recollect it.

''A. I think I have substantially stated it. He said
they had talked it over, and they had come to the
agreement to make these wills. He wanted to give all
his property to his wife, and in case she died before
he did, he wanted it to go to his children equally, and
she wanted to do the same. That is all I can recollect.

"Q. Did they talk the same thing over, in that way, both of them, when that matter came up again?

"A. They had come in for that purpose. He stated again the proposition, and I asked Mrs. Myers if she wanted to make the same kind of a will and she said she did; and we started to talk about something else; and I drew it in accordance with those directions."

On cross-examination counsel for the defendant alluded to the testimony given by the witness in the former contest of Myers' will on the ground of his insanity, and proposed to question him about his declarations on oath in that proceeding. During the discussion of counsel and the court about the regularity of the cross-examination the witness on his own motion interrupted more than once, and finally broke in with this statement:

"Just a minute. I want to make an explanation myself, as this question has arisen there. The issue I was called on in the contest of the Myers will was proving his sanity. This question about these other wills never occurred to me; it never occurred to me it had anything to do with it. I did not try to refresh my memory with reference to the other wills. When this contest came up I did give thought to it, because I was asked to by Judge Webster and Mr. Simon. I looked over the wills and refreshed my memory. That is the difference between testifying once when a thing was in issue, and once when it was not. I was called on to testify as to his sanity. I had not looked at the wills since, except that I probated Mrs. Myers' will and I didn't try to refresh my memory. Then I was called into this case and I went and looked at the wills again."

The foundation of the plaintiff's claim is that the parents made identical wills in pursuance of a contract. This is denied, making it necessary for the plaintiff to prove that averment. Otherwise stated,

she must show by competent proof that the will of her father made on February 11, 1896, was not only executed in pursuance of the agreement as alleged but was indeed identical with that of her mother. The following Sections of our Code affect this question:

Section 712—''There shall be no evidence of the contents of a writing, other than the writing itself, except in the following cases:—

''(1) When the original is in the possession of the party against whom the evidence is offered, and he withholds it under the circumstances mentioned in Section 782.''

(This latter section requires the original writing to be produced and proved except as provided in Section 712, and that if it be in the custody of the adverse party and he fails to produce it on reasonable notice, the contents thereof may be proved as in case of its loss.)   The further provision of Section 712, so far as applicable to this case, is:

''(2) When the original cannot be produced by the party by whom the evidence is offered, in a reasonable time, with proper diligence, and its absence is not owing to his neglect or default.''

Section 802 refers particularly to wills, and reads thus:

''A last will and testament, except when made by a soldier, in actual military service, or by a mariner at sea, is invalid, unless it be in writing, and executed with such formalities as are required by law.   Evidence, therefore, of such will shall not be received, other than the written instrument itself, or secondary evidence of its contents, in the cases prescribed by law.''

We have the statement of the witness that the alleged wills were in his custody for a great many

years and, further, that, ''Then I was called into this case and I went and looked at the wills again.'' If Myers' will was made and was the same, as stated, as that of his wife, the indispensable proof thereof, to wit, the will itself, was plainly within the reach of a subpoena duces tecum and should have been produced. Notwithstanding all this, however, the witness over objection volubly explained the contents of the will orally. Why should he be permitted when ''called into the case'' to go and examine the wills and then come into court and give his oral version of one of them without its being produced? Under the plain provisions of our Code, enforced by many decisions of our own, there was no competent proof of the allegation that Myers made a will identical with that of his wife, or made one at all. For aught that appears in the evidence, even if he made a will at that time, he may have expressly reserved to himself the right to dictate the disposition of his own property and that which he should receive from his wife, without any restriction. It is mentioned in the testimony of some of the witnesses for the plaintiff that the parents often took pleasure trips away from home and that on such occasions the father habitually made the statement that all their affairs were settled and that in case anything happened to them the property would go to the two children; but no witness imputes to him any utterance indicating that the settlement was in fulfillment of any binding contract between him and his wife, or that the adjustment was irrevocable. All this is consistent with the idea that each of the parents retained testamentary control over his or her property then in hand or to be derived from the will of the other. There is nothing in such language in the least indicating any contract of any kind. Indeed, it is passing

strange that in all the years elapsing between the date of the wills of February 11, 1896, and the making of the last will of Mr. Myers in 1902, no word escaped him, so far as the record discloses, indicating a contract between himself and his wife on the subject. Much stress was laid in argument on what Myers said about his wife's being the best partner he ever had and of his counseling with her in important matters. The cross-examination of witnesses narrating such statements reveals that she never took active part in any of his business ventures, but confined herself to the role of a good, helpful wife, an ideal of the character. They appear to have kept their property interests separate and there is quite as much reason to say that he helped her to accumulate her holdings as to exploit the opposite theory.

The only *post facto* suggestion of any arrangement between the parents whatever, coming from the lips of either of the participants, is narrated in the testimony of Mrs. Van Duers. She was a witness for the defendant and a niece of Mrs. Myers who lived about ten years in the family of the father and mother and testified that during the life of the latter at some time subsequent to 1898 she had a conversation with her aunt which she thus relates:

"It was a general conversation I had with my aunt on one occasion in regard to an estate left by a friend in a rather tangled condition; and I remember distinctly asking my aunt if she did not think property should be divided before the death of the parents, and she said, 'No.' I said, 'Why don't you do it?' and she said, 'No, your uncle accumulated it himself, and he has a right to say what shall be done with it; or if he is not here, I have a right to say what shall be done with it.'"

91 Or.—11

Pertinent to this testimony are the following Code provisions:

"Where, however, one derives title to real property from another, the declaration, act, or omission of the latter, while holding the title, in relation to the property, is evidence against the former": Section 706, L. O. L.

"The declaration, act or omission of a deceased person, having sufficient knowledge of the subject, against his pecuniary interest, is also admissible as evidence to that extent against his successor in interest": Section 710, L. O. L.

The statement of Mrs. Myers to her niece is binding upon the plaintiff, who claims in the right of her mother as a contracting party. This is a most natural declaration for Mrs. Myers to make to her niece who had lived in her family for ten years prior to her marriage and was still on intimate terms with her aunt. The voice of the father is hushed in the tomb and cannot speak to us in the defense of his property or of his character against the present attack of his daughter. Such an effort as hers ought not to succeed except upon the most cogent testimony. No member of the family or other person testifies that either of the testators ever stated that there was a contract between them respecting the disposition of their property, or that either of them intended to restrict the other in subsequent disposition of property, unless we except the testimony of Mr. Boise. Again, the course of the plaintiff in contesting her father's subsequent will on the ground of his alleged insanity is inconsistent with the idea of the contract to make a will, and in good morals at least ought to bar her from changing front as she does. If there was a contract, naturally she would have sought its enforcement in the first instance instead of contesting his will. She is not in the equi-

table position of one who has performed valuable services for a decedent with the expectation of being suitably rewarded by a devise or bequest of property. She claims only as a descendant of the testator. She is merely not satisfied with $20,000, and wants more.

The power of disposing of lands or goods owned by an individual is an essential element of property. As against this prerogative of testamentary disposition, children have no vested rights in the estates of their parents. Much of the litigation in contesting wills has grown out of the fallacy that the statute of descents confers upon children benefits of which they cannot be deprived by their parents whether they die testate or intestate. The true legal principle, however, remains that the prerogative of saying who shall enjoy his earnings after his death abides in the parent. It is a wise and just provision of the law for the protection and security of old age. It is often potent to compel the performance of filial obligations and to inspire loyalty in otherwise undutiful children. Except upon cogent reasons plainly established, we ought not to ignore the right of the owner to dispose of his property according to his own ideas or to unmake his will because he did not do as we personally might have done in the same situation.

Although our Code requires a will to be executed in the presence of two attesting witnesses who shall sign the same at the request of the testator in his presence and in the presence of each other, we are called upon by this suit in effect to ignore the statute and substitute for the will established under a contest upon the sanity of the testator, the one made by him February 11, 1896, all upon the statements of the one attorney who drew the wills and who speaks from memory almost eighteen years after the occurrence which he

relates. In this connection the case of *Moore* v. *Campbell,* 102 Ala. 445 (14 South. 780), may be read with profit, to the effect that under a statute similar to our Section 7398, L. O. L., this cannot be done because it is an evasion of the law of wills and an effort to impress a parol trust upon lands in violation of the Code section cited.

As to the making of the contract averred, we cannot rely upon the wills themselves, because they make no reference whatever to each other. As said in *Frazier* v. *Patterson,* 243 Ill. 80 (90 N. E. 216, 17 Ann. Cas. 1003, 27 L. R. A. (N. S.) 508):

"If two persons make wills each devising the property to the other, there is no necessary inference that the wills were the result of any reciprocal or mutual agreement or understanding."

In that case, cited in the opinion of Mr Justice Johns, the court was considering a joint will containing terms of contract, and limited to such an instance the doctrine that the agreement might be established by the terms of the instrument itself. In *Prince* v. *Prince,* 64 Wash. 552 (117 Pac. 255), while holding under the ample extraneous proofs in the case that there was a contract relating to the testamentary disposition of the property of the parents, the court, speaking through Mr. Justice Chadwick, quotes with approval the language of Section 6 of Remson on Preparation and Contest of Wills, as follows:

"But to invoke the intervention of equity it is not sufficient that there are wills simultaneously made and similar in their cross provisions, but the existence of a clear and definite contract must be shown either by proof of an express agreement or by unequivocal circumstances."

See, also, *McClanahan* v. *McClanahan,* 77 Wash. 138 (137 Pac. 479, Ann. Cas. 1915A, 461).

Again, the mother said in her testamentary document:

"I intentionally omit giving anything to my children, Georgia Frances Stevens and George Tobias Myers, Jr., knowing that my husband will care and provide for them."

It would seem that if these wills were made in pursuance of a contract the one would have referred to the other or to the contract, and the. testator would have said something like this:

" * * knowing that my husband has provided for them by will of even date herewith" or "that he has agreed with me to provide for them."

It is worthy of note also that nothing is said by either testator about the kind of care or amount of provision that was to be made for the children by the other. All is left to future disposition. The central idea of the situation as expressed by the language of Mr. Boise is found in his statement, " * * that Mrs. Myers had helped him make his money and he thought he wanted to give everything he had to her, and that she felt the same way." Like that of any other witness, the. analysis of his testimony should be conducted in the light which all the circumstances of the case throw upon it. His acquaintance with the plaintiff runs back to a date before her marriage, and ever since he has been her friend. It is natural that an early friendship for one of the opposite sex would, insensibly at least, influence one in later years. Mr. Boise testifies that he endeavored to disabuse the mind of Mr. Myers of his prejudice against the plaintiff's husband, and it is fair to presume that the witness re-

gretted the action of the father in bequeathing only
$20,000 to the plaintiff. The record justifies the in-
ference that his mind was predisposed to finding a
way by which the plaintiff could share more substan-
tially in her father's accumulation of property.
Although he was one of the principal witnesses in the
contest instituted by the plaintiff to overthrow her
father's will because of alleged insane delusions said
to control him, and detailed the transaction of making
the two wills by the parents with all its preliminaries,
we find in his narrative there not a word indicating
that there was any contract to make irrevocable wills.
He tells of the elder Myers' often talking to him by
the hour about his wife after her death and of draw-
ing his later will and its codicil, but the existence of
a covenant between the father and mother never
occurred to him until, as he puts it, he "was called into
this case." It is at least unlikely that in all those
hours of communing with his friend and client that
agreement was not discussed if it ever was made.
Assuredly something would have been said about it
when his duty as a lawyer called upon him to restrain
that client about to act in violation of his compact
irrevocably sealed by the death of the other party as
he would do in making the later will.

Coming to what the witness says in the present liti-
gation, we find him declaring first that Myers told him
the pair had "decided" to make wills. Prominent
in that connection is the announced purpose of the tes-
tator to give all his property to his wife and his state-
ment that he did not want "to provide anything for
the children now." Finally, however, after eighteen
years of silence about this chimerical contract, with
every opportunity to describe it in the closely con-
tested will case, when pressed by plaintiff's counsel

at the hearing of this suit the witness, like an ex-
hausted runner, stumbles over the line at the finish
with the statement that Myers said, "They had come
to an agreement." No language of stipulation is im-
puted to Mrs. Myers. According to the single wit-
ness, all she said was that she wanted the same kind
of a will, clearly indicating only identical action of
the husband and wife with no thought of creating an
obligation. The idea of restricting the testamentary
power of the survivor by the execution of identical
wills never occurred to anyone until after the death
of the parents. The phrase, "they had come to an
agreement," being an oral admission of a party, must
be viewed with caution: Section 868, subd. 4, L. O. L.
Even if an accurate rehearsal of what Myers said
eighteen years before, it savors too much of after-
thought, under all the circumstances, to measure up
to that clear, precise and convincing proof which all
the authorities require to make out a case for spe-
cific performance of a contract changing the title to
real property otherwise within the statute of
frauds. "Agreement" does not necessarily mean
contract. Jurors "agree" upon a verdict. The pa-
rents "agreed" to make a trip to Mexico, as stated
in the testimony. Yet no obligation arises from
either situation. In short, the testimony discloses no
more than that they were animated by a common pur-
pose and each followed the example of the other.

In speaking of part performance, Pomeroy in his
work on Contracts, Section 108, states the rule thus:

"With this explanation of their probative effect,
the acts of part performance must be done in pursu-
ance of the agreement; must unequivocally refer to
and result from the agreement; or, in other words,
clearly showing that there exists some contract be-
tween the parties they must be exclusively referable

thereto; it must appear that they would not have been done except on account thereof and they must be consistent with the contract alleged. When parol evidence has been admitted to prove the agreement in suit the acts of part performance must be clearly and exclusively referable to and in pursuance of its terms.''

In a note to the preceding section is quoted an utterance of Shadwell, V. C., in *Dale* v. *Hamilton,* 5 Harg. 369:

''It is generally of the essence of such an act of part performance that the court shall by reason of the act itself without knowing whether there was an agreement or not find the parties unequivocally in a position different from that which according to their legal rights they would be in if there were no contract. * * But an act which though in truth done in pursuance of a contract admits of explanation without supposing a contract, is not in general admitted to constitute a part performance to take the case out of the statute of frauds; as for example, the payment of a sum of money alleged to be purchase money.''

In *Wagonblast* v. *Whitney,* 12 Or. 83 (6 Pac. 399), a suit to compel the specific performance of a verbal contract to convey lands, Mr. Justice Lord discussed the authorities at length and said, respecting the measure of proof:

''Nor will the specific performance of a parol contract be granted, unless it be proved in the clearest manner and substantially the same contract as set out in the bill: *Brown* v. *Brown,* 47 Mich. 384. These are salutary but stringent rules, in the observance of which the interests of society and the public welfare are involved. A party is presumed to know the requirements of the law, and that a contract for the sale of land must be in writing. When he asks a court of equity to interfere, and save him from the consequences of his disregard of the law, the burden of

proof is rightfully thrown upon him to show a case outside of the operation of the statute. The court will not interfere to protect his rights, and lend its aid to the enforcement of a contract depending upon parol evidence and part performance, unless he proves the existence of the contract, its terms, and the acts of part performance by clear, satisfactory and indubitable proof." (Citing authorities.)

In *Kinney* v. *Murray,* 170 Mo. 700 (71 S. W. 202), the court said:

"But the proof of such a contract must be so cogent, clear, and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character; and, where the consideration consists of acts to be performed, there must be like proof that the acts performed refer to and result from that contract, and are such as would not have been done unless on account of that very agreement and with a direct view to its performance. There must be no equivocation or uncertainty in the case."

In *Berg* v. *Moreau,* 199 Mo. 416 (97 S. W. 901, 9 L. R. A. (N. S.) 157), the court lays down the standard that:

It must appear "not only that some contract was performed by the beneficiary, but that the identical contract sued on was performed, and that the acts relied on to show performance should point unvaryingly as the needle to the pole to the contract in suit and to no other"; and that the principles are "well settled as requiring a high and stringent character of proof, to wit, proof so impelling, so definite and clear, that there can be no reasonable doubt of the existence of a contract, of its terms, and of its performance."

Respecting the rule that the evidence must clearly and exclusively refer to the contract pleaded and to no other, without equivocation, an analogy may be drawn from the rule laid down by Mr. Justice McBRIDE in

*Spain* v. *Oregon-Wash. R. & N. Co.,* 78 Or. 355 (153 Pac. 470, Ann. Cas. 1917E, 1104), where he says:

"When the evidence leaves the case in such a situation that the jury will be required to speculate and guess which of several possible causes occasioned the injury, that part of the case should. be withdrawn from its consideration."

The rule is thus laid down in *Johnson* v. *Devine,* 166 Ill. App. 341:

"When such a contract is made the basis of an action, the evidence in support of it should be looked upon with great jealousy, and weighed in the most scrupulous manner, and the character, conduct and testimony of the witnesses should be such as to inspire confidence that they are telling the truth. Such a contract can only be enforced when it is clearly proved by direct and positive testimony, and when the terms of the contract are definite and certain. The most stringent doctrines of the court should be applied in such cases."

In *Wilson* v. *Gordon,* 73 S. C. 155 (53 S. E. 79), two maiden sisters, after a conference on joint request in writing had two wills prepared by the same attorney giving all the property of each to the other without limitation, with the provision that if the devisee should die in the lifetime of the testator the property should go to a niece and her children; and it was held that they were not mutual wills and that the surviving sister after having accepted the benefits of the deceased sister's will might destroy her own will. The court says in that opinion:

"But where a contract to make or not to revoke a will is set up there are strong reasons for requiring an agreement definite and certain established by evidence clear and convincing. The evidence comes from the living against the dead who cannot speak in

his own behalf in disproof of a charge of a violation of a solemn obligation. * * The discussion by two persons bound to each other by the closest ties of affection as to the disposition of their property resulting in separate wills by which the property of each was left to the other affords no ground for the inference that they undertook or exacted a legal obligation.''

Speaking further, the court said:

''But there are some facts which go towards disproving any contract. Not only was there no intimation from either of the sisters that they so understood it in the lifetime of Miss Mary, but the terms of the wills are very significant. They were prepared with great care and after much consideration. The fact that there was an absolute devise from each sister to the other without limitation was strong evidence that there was no intention to limit the power of alienation. When an intention is reduced to writing, either in the form of a will or a contract, there is always the strong implication of fact that the whole intention has been expressed and an implication still stronger that there is no agreement or intention contrary to that expressed.''

*Hale* v. *Hale,* 90 Va. 728 (19 S. E. 739), was a case where two sisters made identical wills. One of them married, before which, however, she consulted an attorney, who advised her that her marriage would have no effect on her will. She died under that belief and never republished her testamentary document. After stating the principles relating to part performance, the court said:

''Now the alleged acts of part performance in the present case taken singly or collectively do not bring the case within these principles. The making and preserving the wills under the circumstances stated in the bill, while they are acts consistent with, are yet

not demonstrative of, the existence of any contract between the parties, or, in other words, they do not unequivocally show that there was a contract. *Non constat* the wills were not made from motives of love and affection and independently of any contract or agreement, and this being so, parol evidence to establish the alleged contract would not be permissible.''

*Wanger* v. *Marr,* 257 Mo. 482 (165 S. W. 1027), was a case in which the husband and wife each executed a will. By these each was given a life estate in the property of the other and the remainder was devised to plaintiffs and defendant. The wife died and the husband took possession of her land. Afterwards he executed another will inconsistent with the former, and died. The court held that the evidence was insufficient either to prove a contract or to require specific performance thereof. In *Sappingfield* v. *King,* 49 Or. 102 (89 Pac. 142, 90 Pac. 150, 8 L. R. A. (N. S.) 1066), it'appears that a husband and wife, after consideration of the same for some weeks, went to the office of an attorney where the wife executed a deed conveying to her husband all her land, to take effect after her death, and he made a will bequeathing his property to her while she lived, with remainder to other parties. He died first and in a suit by the widow to quiet the title to her lands as against a claim of the residuary legatees of her husband it was contended that the testimony showed a binding contract between the husband and wife to make mutual wills, which became irrevocable upon the death of one of the contracting parties. It is enough to say of the record in that case that it went much farther than anything revealed here to establish such a contract. Mr. Justice EAKIN, however, dismissed the contention, holding that the testi-

mony was insufficient to fulfill the standard requiring clear and convincing evidence of a contract specific performance of which is desired.

The principle to be deduced from all the authorities on part performance is that it must point unequivocally and undisputably to the contract alleged and to nothing else. If it can be referred to any other contract or arrangement it is insufficient. Applying the rule to this case, in the light of the only written memorial of the transaction between husband and wife, namely, the two wills of February 11, 1896, we will suppose that instead of the one alleged there was in fact a contract between the husband and wife that each should leave the entire estate to the other, with discretion to provide for the children as the survivor should think best. The two wills as drawn would be the only practical expression of such intention. More than two years after they were executed we find Mrs. Myers saying to her niece, Mrs. Van Duers:

"No; your uncle accumulated it himself and he has a right to say what shall be done with it, or if he is not here I have a right to say what shall be done with it."

She doubtless had in mind at the time the two wills in question. If the complaint is true she knew that they were identical in their terms. Her statement to her niece clearly shows her attitude towards that arrangement and is utterly inconsistent with a covenant to devise the property of the survivor absolutely and at all events to the children in equal shares. If, as Mrs. Myers said, her husband had the right to say what should be done with the estate he certainly was not fettered by any contract to dispose of it only in a certain manner and to two particular persons.

The parents evidently intended to leave the whole property to the one remaining after the first decedent, to dispose of without any restraint or condition whatever. The acts of the parties and the declaration of Mrs. Myers coincide and harmonize with that estimate of their transaction. The only memorial of the matter which either spouse required of the other was a will to which the law attaches the quality of revocability at the pleasure of the testator. They were not making a fixed and definite contract. They were publishing ambulatory wills each subject to renunciation at any time. Referable as it is to an agreement leaving the whole disposition of the estate to the discretion of the survivor, the testimony about a mere casual expression of the testator is not sufficient to support specific performance of an irrevocable contract to make a will.

Neither of the parties ever contemplated giving up control of their several properties either then or afterwards. That the survivor was left untrammeled in that respect is made as clear as possible by the language of Mrs. Myers in her conversation with her niece, Mrs. Van Duers. This statement of the plaintiff's mother, one of the couple who of all others knew what the transaction really was, properly characterizes the subject of the present contention. It is consistent with the only written memorial they left, the wills themselves. It is not at variance with the testimony of Mr. Boise.

It must be presumed that the private transaction of Myers in making the last will and its codicil was fair and regular, favored as he was by the ministrations of able counsel. In this long-drawn-out scramble for filthy lucre there were those who had the opinion that he was mentally erratic, but although he had a long

and successful business career, bringing him into contact with many people, none rose to impeach his loyalty to his contracts until his daughter attacked it by this suit. We cannot presume that he broke faith with his departed wife. The presumption is the other way, and the truth is manifestly as she herself stated it to Mrs. Van Duers.

Let us concede for the moment that the parents had some kind of an agreement, understanding or arrangement. Let us even, as we might under the testimony, suppose that the compact was that the survivor should take all the property of the other with full discretion about leaving any of it to the children and without restriction upon testamentary disposition of it by the one living longer. In such a case how differently would they have framed their wills from the way the plaintiff alleges they did? In all the divagations of discussion no one has answered this question. If we are to be bound by the rule laid down by substantially all the authorities to the effect that the evidence to support a decree for specific performance must clearly prove the contract alleged, the question cannot be answered consistently with a reversal of the decree of the Circuit Court.

Under such circumstances we would do violence to the almost unbroken current of authority on part performance and assume to make for the survivor a will according to our own notions, if we reversed this case. A contrary view of the record would make it impossible for one spouse to bequeath anything to the other without raising the presumption of a contract requiring the same, and would unreasonably fetter the right to dispose of estates by will. The following cases are instructive on the subject under consideration: *Christy* v. *Barnhart,* 14 Pa. 260 (52 Am. Dec.

543, and note); *Swash* v. *Sharpstein,* 14 Wash. 426
(32 L. R. A. 796, 44 Pac. 862); *Semmes* v. *Worthing-
ton,* 38 Md. 298; *Wallace* v. *Rappleye,* 103 Ill. 231;
*Grindling* v. *Rehyl,* 149 Mich. 641 (113 N. W. 290, 15
L. R. A. (N. S.) 466); *Horton* v. *Stegmyer,* 175 Fed.
756 (20 Ann. Cas. 1134, 99 C. C. A. 332); *Russell* v.
*Jones,* 135 Fed. 929 (68 C. C. A. 487); *Taylor* v. *Higgs,*
202 N. Y. 65 (95 N. E. 30); *McClanahan* v. *McClana-
han,* 77 Wash. 138 (137 Pac. 479, Ann. Cas. 1915A,
461); *Buchanan* v. *Anderson,* 70 S. C. 454 (50 S. E.
12); *Gould* v. *Mansfield,* 103 Mass. 408 (4 Am. Rep.
573); *Cawley's Appeal,* 136 Pa. 628 (20 Atl. 567, 10
L. R. A. 93); *Cross* v. *Cleary,* 29 Ont. 542; *Tousey* v.
*Hastings,* 127 App. Div. 94 (111 N. Y. Supp. 344); Id.,
194 N. Y. 79 (86 N. E. 831); *Messier* v. *Rainville,* 30
R. I. 161 (73 Atl. 378); *Kinney* v. *Murray,* 170 Mo. 674
(71 S. W. 197); *Edson* v. *Parsons,* 155 N. Y. 555 (50
N. E. 265); *Dicks* v. *Cassels,* 100 S. C. 341 (84 S. E.
878); *Dyess* v. *Rowe* (Tex. Civ. App.), 177 S. W.
1001; *Brewer* v. *Hieronymous* (Ky.), 41 S. W. 310;
*Wallace* v. *Wallace,* 158 App. Div. 273 (137 N. Y. Supp.
43, 143 N. Y. Supp. 1148); *Davidson* v. *Davidson,* 72
W. Va. 747 (79 S. E. 998).

As taught by subdivision 1 of Section 868, L. O. L.,
summing up let us judge of the effect of the evidence
not arbitrarily but with legal discretion and in subor-
dination to the rules of evidence, and so doing ascer-
tain where the preponderance lies. On one side we
find the statement of a single witness undertaking to
recall after a lapse of eighteen years the language
of Myers that "they had come to an agreement" to
make identical wills. As to whether they were to be
so alike or were in fact the same, we are asked to
accept the oral interpretation of the witness who says
he had custody of them many years and went and

looked at them after he "was called into this case."
No excuse whatever is offered for not producing the
will itself.   This is all that fairly can be set down on
the plaintiff's side of the account.   On the other side
is the version given to the arrangement by Mrs. Myers
as related in the testimony of her niece.   This is sup-
ported by the presumptions that Myers was innocent
of the wrong of violating a contract made with his
deceased wife; that the transaction of making his last
will was fair and regular and that the higher evidence
of the will made when his wife made hers, if he made
one, viz., the will itself, would be adverse from the
production of the inferior or oral evidence of its con-
tents: Section 799, subds. 1, 19 and 6, L. O. L.   Nega-
tively the defendant's case is aided by the fact that
although Myers lived from February 11, 1896, to July
12, 1907, yet no witness, not even his attorney to whom
he talked so freely, imputes to him during all that time
any word indicating a contract.   There is also the
improbability that if he and his wife were negotiating
an agreement he would consent to relinquish all future
testamentary control of his $200,000 worth of property
in consideration of her doing the like with her $40,000
worth.

On the record Mrs. Van Duers is quite as worthy
of belief as Mr. Boise.   Laying aside for the moment
all the statutory presumptions noted, the best that can
be said for the plaintiff about the weight of the testi-
mony is that the statements of these two witnesses
balance each other.   Yet they are the only ones who
pretend to state any thing about an agreement.

But it is incumbent upon the plaintiff to prove her
case by a preponderance of the evidence, otherwise
she must fail.   On the other hand, the presumptions

turn the scale in favor of the defendant and he is entitled to prevail.

The remaining insuperable objection to the plaintiff's case is that it is an attempt to create a trust concerning real property upon the doubtful oral testimony of a single witness without the support of a single act of either party but what is easily and naturally referable to an unrestricted noncontractual devise. In this respect the case is plainly governed by Section 804, L. O. L.:

"No estate or interest in real property, other than a lease for a term not exceeding one year, nor any trust or power concerning such property, can be created, transferred, or declared otherwise than by operation of law, or by a conveyance or other instrument in writing, subscribed by the party creating, transferring, or declaring the same, or by his lawful agent, under written authority, and executed with such formalities as are required by law."

And Section 7398, L. O. L.:

"Every grant or assignment of any existing trust in lands, goods, or things in action, unless the same shall be in writing, subscribed by the party making the same, or by his agent lawfully authorized, shall be void."

To sustain this suit under such circumstances is to make the title to real property subject to the slightest vagary of memory. It is to invite plunder of estates, on the most flimsy pretexts. Besides all this, it is well settled that equity will not, as a matter of right, decree specific performance of any contract. It rests solely in the sound discretion of the court and we cannot say upon this record that the circuit judge who heard the testimony, saw the witnesses and considered all the circumstances and relations of the parties, abused

his discretion in denying the suit of the plaintiff. Neither is the case made by the plaintiff sufficient to impute fraud to the dead father or to authorize us to record him as a faithless covenant breaker at the suit of his daughter. The decree of the Circuit Court should be affirmed.