Argued October 24; reversed November 19; rehearing denied December 24, 1929; motion to recall mandate denied February 18, 1930.

## HOLMAN ET AL. *v.* LUTZ ET AL.

(282 P. 241, 284 P. 825)

*W. Lair Thompson* and *Roscoe C. Nelson*, both of Portland, for appellants.

*Russell E. Sewall* and *Guy C. H. Corliss*, both of Portland, on the brief for appellant Edward Guy Holman.

*Leslie S. Parker, Dey, Hampson & Nelson,* and *McCamant & Thompson,* all of Portland, on the brief for other appellants.

*C. Henri Labbe* and *Joseph H. Page,* both of Portland (Martin L. Pipes, J. M. Pipes and G. A. Pipes, all of Portland, on the brief), for respondents.

188

\* \* \* \* \*

HAMILTON, A. A. J. This suit has to do with the married life of Julia Holman and Edward Holman, and the incident therein that during said time, namely, on the 5th day of December, 1912, they had executed their respective wills hereinbefore set forth, one in favor of the other. The contention is made by respondents that the said persons contracted with each other to the effect that each would make a will in favor of the other, as partly expressed in the terms of the wills; that such contract was in consideration of the promise of the other, and that by the terms of said agreement said wills should be irrevocable.

The question presented is as to the law controlling the character of evidence and measure of proof required before specific performance of such alleged

contract shall be found and decreed by a court exercising equitable jurisdiction, and the further question, "Has such contract been proven?"

There has been called to our attention the judicial expression of contemporary courts regarding causes submitted to them involving a similar question to that which is presented in the instant case. Indeed, the execution of simultaneous mutual and reciprocal wills, their construction and legal effect, is a subject about which there has been much judicial utterance. However, an examination of these precedents shows a contrariety of judicial opinion as to the law governing the measure of proof required in cases of this character, and further that each case is decided upon the peculiar facts therein presented.

The claim is made in this case that the wills themselves, considered in connection with the circumstances under which they were executed, together with the receipt of the bequest therein provided for, are sufficient to prove the agreement set forth in plaintiffs' complaint. There is no evidence of any express oral contract. May such contract be inferred from the evidence of all the circumstances introduced in evidence?

*Anderson v. Anderson,* 181 Iowa 578 (164 N. W. 1042), and similar in many respects to the present case, is cited by counsel for plaintiffs as illustrating and stating the law as contended for. In rendering its decision in that case, the court makes the following statement as to the law:

"That the two wills in this case were intended to be reciprocal can hardly be doubted, unless we are to discard all extrinsic evidence. Probably, since the wills bear different dates, the mere fact that each makes the other spouse the sole beneficiary would not,

of itself, be sufficient to indicate any agreement or understanding that the two instruments were to be mutual or reciprocal, for such wills might be executed without either party's knowing what the other had done in that respect. But we think there is no rule of evidence which excludes proof of facts tending to show that the husband and wife did not act each with the knowledge of the other; that the two wills were drawn by the same person at the same time and in identical terms and at the joint request or direction of both husband and wife; and that, although the dates of their execution differ by a few days, they were in fact executed in pursuance of a common understanding and purpose.''

Quoting from *Frazier v. Patterson,* 234 Ill. 80 (90 N. E. 216, 27 L. R. A. (N. S.) 508, 17 Ann. Cas. 1003), the opinion states as follows:

''If evidence of a mutual compact is necessary in such case, that evidence is afforded by what the parties did. We can not see how the situation would be any different if witnesses had testified that they heard this husband and wife discuss what disposition they would make of their respective estates, and that they agreed with each other that they would make a joint will such as they did make. The fact that they made such will is satisfactory proof to our minds that it was done in accordance with their mutual compact to dispose of their property in this manner.''

Further citations are *Brown v. Johanson,* 69 Col. 400 (194 P. 943); *Hermann v. Ludwig,* 186 App. Div. 287, 229 N. Y. 544 (174 N. Y. S. 469, 129 N. E. 908); *In re Weir's Estate,* 134 Wash. 560 (236 P. 285); *Harris v. Morgan,* 157 Tenn. 140 (7 S. W. (2d) 53). The following distinguishing features are to be found in some of the cases cited:

In *Brown v. Johanson,* supra, the question involved was whether the respective wills, the subject of the controversy, there introduced in evidence, were

obnoxious to the provisions of § 2662, Revised Statute of the state, being the statute of frauds. The court says:

"No good purpose can be served by a detailed review of the evidence herein. Suffice it to say that, in our judgment, it warrants the finding of the trial court of the existence of the alleged *oral* agreement."

At page 471 of 174 N. Y. S., in the case of *Hermann v. Ludwig,* supra, the court points out that on the face of the joint will in question the testators declared "this, and this only, to be our joint and mutual will and testament." And, at page 479 of this authority, the court refers to the evidence of express declarations alleged to have been made at the time of the execution of the joint will, that "it was drawn in pursuance of an agreement that it should be irrevocable." In *Hermann v. Ludwig,* supra, the question determined was whether the wills were sufficient to admit oral evidence of the alleged oral contract. And in *Weir's Estate,* supra, a like question was presented.

It would unduly prolong this opinion to undertake an analysis of the many citations of authorities furnished the court by counsel. No useful purpose may be subserved thereby. Particularly is this true in view of the exhaustive review of the authorities on this subject heretofore given by this court in the case of *Stevens v. Myers,* 91 Or. 114 (177 P. 37, 2 A. L. R. 1155). The principle of law involved in the discussion is not a new one in this court. In the Stevens case reference is made to the case of *Sappingfield v. King,* 49 Or. 109 (89 P. 142, 90 P. 150, 8 L. R. A. (N. S.) 1066), wherein the court says the question arose out of the following facts:

"On February 1, 1897, plaintiff was the owner of the land in question, and her husband, John Sapping-

field, owned other property. Plaintiff at that time was 77 years old and her husband 87. Plaintiff was in poor health, and both she and her husband were desirous of making provision for the disposition of their property after their death, and, after consideration of the same for some weeks, on February 1, 1897, they went to Salem, and in the office of M. W. Hunt plaintiff duly executed a deed to John Sappingfield, her husband, for the land in question for the consideration of love and affection and the sum of one dollar, the operative words of which are, 'have bargained and sold, and by these presents do bargain, sell and convey unto my husband. * * * This deed is made with the full understanding and upon the condition that the same shall take effect from and after the death of the said grantor herein, and it is understood and intended that this deed shall be recorded immediately after my death.'

"At the same time, and as a part of the same transaction, the husband, John Sappingfield, made a will, disposing of all his property, the second clause of which is as follows:

" 'I hereby give and bequeath all the property of which I may die seized, to my wife, Mary Sappingfield, the same to be used by her during her natural life, and at her death I hereby direct,' etc."

Upon this state of facts, the court speaks as follows:

"The motion raises for the first time the question that the deed of plaintiff and the will of the husband are mutual and reciprocal wills based on a compact, and for that reason irrevocable. The most that can be said for these two instruments is that they are mutual and reciprocal, but each stands as an independent will unaffected by the other. Some authorities hold that in a case where such wills are executed in pursuance of an agreement based on a valuable consideration, after the death of one the will of the other is irrevocable; but in such a case the agreement must be certain and definite, and the court must have full and satisfactory proof of it. * * *

"In *Gall v. Gall,* 19 N. Y. S. 332, 64 Hun. 600, relating to an agreement for a specific devise, the court says:

" 'It is certain, however, that in this class of cases the ordinary rules which govern in actions to compel the specific performance of contracts, and which furnish reasonable safeguards against fraud, should be rigidly applied. These rules require that the contract be certain and definite in all its parts, that it be mutual and founded upon an adequate consideration, and that it be established by the clearest and most convincing evidence.'

"In *Edson v. Parsons,* 155 N. Y. 555 (50 N. E. 265), a case of an agreement for reciprocal wills, it is said:

" 'I think it needs no further argument to show that to attribute to a will the quality of irrevocability demands the most indisputable evidence of the agreement which is relied upon to change its ambulatory nature, and that presumptions will not, and should not, take the place of proof.'

"Here the evidence shows that plaintiff and her husband were getting quite old. Each owned separate property. The plaintiff had been quite sick, and it was arranged that they would have their wills made; and this deed and the will were the result. There is no testimony disclosing that any agreement was made between them as to the terms of the wills, or that one was to be the consideration for the other. There is nothing in the evidence to show that the wills were made in fulfillment of the terms of any contract or agreement."

The cases of *Edson v. Parsons,* 155 N. Y. 555 (50 N. E. 265); *Howells v. Martin,* 101 N. J. Eq. 275 (137 Atl. 565); *Menke v. Duwe,* 117 Kan. 215 (230 P. 1065); *Wanger v. Marr,* 257 Mo. 482 (165 S. W. 1027); *Wallace v. Wallace,* 216 N. Y. 28 (109 N. E. 872), are each in harmony with *Sappingfield v. King,* supra. The case of *Wanger v. Marr,* supra, overrules the case of *Bower v. Daniel,* 198 Mo. 325 (95 S. W. 347), which is sometimes cited as

authority for the proposition that the mere execution of reciprocal wills is evidence of a contract of irrevocability. *In re Burke's Estate,* 66 Or. 252 (134 P. 11), the opinion being rendered by Mr. Justice McBRIDE, it was held that in a will contest the contestants can not try out in such proceeding "the question as to whether the wills were mutual and based upon an agreement that the survivor should leave his or her property to a particular person. Such an agreement is valid if performed by the making of such wills and the acceptance by the surviving party of the fruits of the agreement, but it is valid only as a contract, the performance of which by one party and acceptance by the other has taken it out of the statute of frauds."

The question in the instant cause was not involved —that is, the conclusiveness of the respective wills and their cross provisions as in themselves constituting evidence of a contract irrevocable in its nature. These authorities with unanimity hold to the doctrine that the existence and terms of the contract must be established by the most clear and satisfactory evidence. In *Edson v. Parsons,* supra, it is said:

"A general maxim, which equity recognizes, is that a testator's will is ambulatory until his death. It is a disposition of property which neither can, nor is supposed to take effect until after death. I think it needs no further argument to show that to attribute to a will the quality of irrevocability demands the most indisputable evidence of the agreement which is relied upon to change its ambulatory nature, and that presumptions will not, and should not, take the place of proof."

In respondents' brief, at page 78, is the statement that the court in *Stevens v. Myers,* supra, decided that the wills themselves in that case—being very similar in many of the aspects to this cause—when considered

in connection with the circumstances under which they were executed, were evidence of and showed the agreement between the testators so to dispose of their property. The statement is not clear as to the contention made. The wills in a given case may alone be sufficient, depending upon their terms. But the matter for the determination of this court is as to the rule of law to be applied to the facts in the matter under consideration. We have announcement thereof in *Sappingfield v. King,* supra. We turn to *Stevens v. Myers* to discover if in the course of that opinion there is any statement of the law therein contained which militates against *Sappingfield v. King,* supra. In a review by the court in *Stevens v. Myers,* of the authorities cited, among others was quoted that which appears in *Edson v. Parsons,* supra, and it is further said in the opinion set forth that said case was cited and approved by Mr. Justice EAKIN in the cause of *Sappingfield v. King;* and further in the opinion of *Stevens v. Myers,* the court makes announcement as follows:

"After again reading the testimony, carefully studying and examining the respective wills and rereading all of the authorities, and upon a further consideration of all of the surrounding facts and circumstances which obtained at the time the wills were executed, we are of the opinion that the wills in question were executed pursuant to an agreement and understanding between the deceased George T. Myers and Sally S. Myers; that there was a valid and mutual consideration for such agreement, and that in equity and good conscience the agreement should be enforced."

There is no intimation therein of an intention to disturb or in any way modify the rule of law heretofore adopted.

██ Respondents have objected to the admission in evidence of the alleged declarations of Edward Holman while in possession and exercising the right of ownership over the property, the subject of dispute. It must be kept in mind that there is no dispute about the terms of the wills. They are plain and unambiguous. But the dispute arises upon the allegation that the parties entered into a contract, either express or implied, that the wills, by reason of the contract as set forth in plaintiffs' complaint, should be irrevocable. These declarations would seem to be admissible under Or. L., § 706, as an admission which tends to show an inconsistency with plaintiffs' claim of ownership. Such seems to have been the rule adopted and practice followed in the cases of *Sappingfield v. King,* supra, and *Stevens v. Myers,* supra. Through the evidence herein submitted, we are in part made acquainted with the lives of Edward Holman and his wife, Julia. The witnesses, those who were acquainted with them, agree that they were a very congenial and happy married couple, giving evidence of great love for and confidence in each other. In the month of December, 1912, these people were preparing to take an extended ocean voyage. In contemplation thereof, they decided to execute their wills, and to assist them as legal adviser in connection therewith they employed Mr. Thos. N. Strong, a competent attorney. The result was the execution on December 5, 1912, of the documents in evidence which are the subject of the controversy in this proceeding. There has not been introduced in evidence any statement or declaration of either party to the execution of said instruments at said time or at any time thereafter, showing, or tending to show, that there was any purpose to enter into an agreement to the effect that these writings, or either of them so

made, should be irrevocable. Nor is there any evidence of any other disposition of their property, or of any attempt to dispose of the same except as stated in the terms of said wills. In view of the fact that a competent attorney attended to the matters pertaining to said business, and advised with them, this fact becomes a circumstance which is entitled to some consideration. It would seem that a matter of such importance as impressing upon the properties a trust, binding and conclusive for all time, and renouncing by each party a very valuable right, would have received some attention in the wills themselves, or, if not in the writings, then in a contemporaneous written agreement. There is the added fact that the same attorney assisted Mrs. Holman in the transaction wherein she conveyed to Walter J. Holman a 24/25 interest in the Holman undertaking business, being property embraced in said wills. This evidence tends to negative the statement or inference that Mr. Thos. N. Strong, the attorney, or Julia Holman, the client, was conscious that the properties so owned by Julia and Edward Holman had been impressed with the trust alleged through a contract by her made, and that her said will, by reason of an agreement made by her to that effect, was irrevocable. Their acts are inconsistent with such contract having been entered into. The declarations of Edward Holman hereinbefore referred to are equally inconsistent with the theory that said agreement as alleged in plaintiffs' complaint was made. For all that appears in evidence, the wills may have been made with no other thought in mind than as found expression in the documents executed by them. The evidence fails to satisfy the court by the degree of proof required by law that the contract set forth in plaintiffs' complaint and

relied upon in this cause has been proved. The evidence of plaintiffs is confined to the execution of the wills and the surrounding circumstances.

We have carefully considered the evidence, as well as all legal authorities cited, and are convinced that the decree sought by plaintiffs is unwarranted. The decree heretofore rendered by the trial court is reversed, and the plaintiffs' suit dismissed.

ROSSMAN, J., not sitting.

---

Motion to recall mandate denied February 18, 1930

ON MOTION TO RECALL MANDATE

(284 P. 825)

RAND, J. Plaintiffs have filed in this court and cause a motion to recall the mandate upon the ground that Honorable James W. Hamilton, a circuit judge who participated in the hearing and decision of the cause and wrote the opinion of the court therein, was not at the time a constitutional member of the court and, therefore, the decision rendered is void. Their argument in support of the motion is that, under the constitution of this state, the supreme court is constituted of seven members only—a chief justice and six associate 'justices—all of whom were living and they say were performing their judicial functions at the time this cause was heard and determined.

By reason of serious illness, Mr. Justice Brown, one of the regularly constituted justices of this court, has been unable to bear his part of the work for about eight months last past and has been absent from the court during most of said time, and during all of the time that Mr. Acting Justice Hamilton has been sit-

ting. As is well known to the public generally, and particularly to those having business before the court, the work of this court has been congested for years and until quite recently litigants have suffered because of the delay in having their cases tried and determined. That condition has been largely ameliorated but it has not been entirely done away with. In order to relieve the situation the legislature in 1921 passed an enactment authorizing the supreme court, during the absence or inability of one of its members to do his part of the work, to designate any judge of the circuit court to sit temporarily as a member of the supreme court and declared that the decisions and determinations of the court, while such circuit judge was so sitting, "shall be binding to the same effect as though no circuit judge were sitting and taking part." Chapter 388, L. 1921, p. 650. There was, therefore, full legislative authority for the selection and designation of Judge Hamilton to act as assistant associate justice of this court during the absence and inability of Mr. Justice Brown.

Plaintiffs say that this act is unconstitutional because it violates the provisions formerly contained in section 2 of article 7 of the state constitution, which provided that the number of justices of the supreme court "shall never exceed seven." It is true that Mr. Justice Brown is a regularly constituted associate justice of this court and is still in office although, because of illness, unable at present to perform his judicial functions. It is also true that, in addition to Mr. Justice Brown, there are six other regularly constituted members of the court and that Judge Hamilton is also temporarily acting as such. Whether this would be a violation of section 2 of article 7 of the

original constitution, if that section were still in force as a part of the organic law of the state, is unnecessary for decision, for that section is no longer a part of the state constitution. Section 2 of article 7 of the original constitution was abrogated by the 1910 amendment of said article 7, but by virtue of section 2b of article 7, as amended, its provisions were to remain in full force and effect until changed by subsequent legislation. The effect of this was to withdraw the provisions of section 2 from the organic act of the state, but still to preserve its provisions as existing law until changed by some subsequent legislation and to render all of its provisions subject to change at any time by the legislative department of the state. The 1910 amendment, as adopted, provided that, "Article 7 of the constitution of the state of Oregon shall be and the same is hereby amended to read as follows." This amendment when adopted had the effect of excluding from article 7 as amended all provisions formerly contained therein which were not included in the amendment, one of which was said section 2. But, as stated, the provisions of what had been formerly section 2 were preserved as existing law, subject, however, to change by the legislature, by section 2b of article 7 as amended, which provides as follows:

"The courts, jurisdiction, and judicial system of Oregon, except so far as expressly changed by this amendment, shall remain as at present constituted until otherwise provided by law. * * *."

■ As we have attempted to point out, this saving clause so written in the amendment and adopted as a part of it had two effects: Every provision contained in article 7 of the original amendment not included in article 7 as amended, unless conflicting with the

amendment, continues in force until changed by legislative act, but all such provisions are subject at all times to change by the legislature. The former decisions of this court holding to this effect are so numerous and the holdings of the court have been so uniform that the citation of authorities would seem to be unnecessary. We cite, however, *Jacobson v. Holt,* 121 Or. 462 (255 P. 901), and *State v. Farnham,* 114 Or. 32 (234 P. 806), and authorities cited in the last case.

 Another objection urged by plaintiffs, coming within the same category and subject to the same ruling as the objection just considered, is that, under section 4 of article 7 of the former constitution, which section is not contained in the amendment, every vacancy in the office of justice of the supreme court shall be filled by election or by appointment of the governor. The answer to this objection is so obvious and there are so many answers which could reasonably be made that it would seem hardly necessary to discuss them. In the first place there has been no vacancy in the office of justice of the supreme court by reason of the disability of Mr. Justice Brown and the temporary appointment of Judge Hamilton as acting justice. Judge Hamilton is not filling a vacancy within the meaning of the former constitutional provision referred to. He is not an associate justice of the supreme court. He is only temporarily performing duties as such under authority conferred by the statute. He is still a regularly constituted circuit judge and is performing other and not inconsistent judicial duties imposed upon him by law. Nor is there anything in the contention made that he is filling two lucrative offices at the same time which, if true, would be in violation of article 2, section 10, of the state constitution. A lucrative office

within the meaning of the constitution is one whose pay is affixed to the performance of the duties of the office: *State v. Slagle,* 115 Tenn. 336 (89 S. W. 326). A constitutional provision prohibiting the holding of two lucrative offices does not prevent the assignment to one officer of the duties of another where there is no inconsistency between the two classes of duties: 29 Cyc., Title "Officers," p. 1384. Nor does such a provision apply to a temporary appointment for reasons of necessity: 46 C. J., Title "Officers," p. 945. Such provisions do not prohibit one of the judges of a court from serving as acting judge of another court created by statute: *State v. Ritchie,* 97 Ohio St. 41 (119 N. E. 124). Statute conferring on judges already in office additional jurisdiction or imposing additional duties on them are not in violation of a constitutional provision that they shall hold no other offce: 33 C. J., Title "Judges," § 17.

If it could be conceived that the temporary appointment of Judge Hamilton to assist this court under the authority conferred by statute during the temporary illness of Mr. Justice Brown would constitute the holding by Judge Hamilton of the office of an associate justice of this court, it would necessarily follow that his appointment here would *ipso facto* vacate his previous office as circuit judge, and for that reason he could not be holding two offices at the same time. But his appointment here and his performance of the duties of an acting associate justice of this court does not have the effect of making him an associate justice of this court but merely imposes upon him other duties than those performed by him while acting as a circuit judge. See *State v. Wood,* 175 N. C. 809, 820 (95 S. E. 1050). The statute fixes the emolu-

ments of Judge Hamilton while temporarily performing the duties of an acting justice of this court by providing that his salary while so acting shall be the same as when discharging his duties as circuit judge and that no additional salary or compensation shall be allowed except that, under another statute, he is entitled to receive the expenses of a circuit judge when sitting at a court which is held at a place outside of his place of residence.

For these reasons the motion to recall the mandate must be denied and it is so ordered.

COSHOW, C. J., concurs in result.

HAMILTON, A. A. J., did not participate in this case.

------

COSHOW, C. J. (concurring). I concur in the conclusion of Mr. Justice Rand. I cannot concur with the reasons he gives for the decision. It is my opinion that the validity of the decree and decision of this court cannot be determined or questioned as defendants attempt to do in their motion to recall the mandate. No one would claim that the motion and brief supporting the motion has anything to do with the merits of the case. The authorities are general, uniform and universal that the validity of the acts of an officer while acting under color of authority cannot be questioned by attacking the right of the officer to hold the office. The question is now presented upon a motion to recall the mandate after the case has been determined upon its merits and a petition for rehearing denied.

Judge Hamilton wrote the opinion for the court. The court rendered the decision and made the decree, not Judge Hamilton. Judge Hamilton has been a circuit judge continuously, serving the Second district

of the state of Oregon in that capacity, since the first Monday in July, 1898. Judge Hamilton is here by virtue of chapter 338, Laws of 1921, which provides among other things:

"Whenever the business of the supreme court is congested and any judge of that court is by reason of illness, or other good cause, unable to bear his part of the work of said court, the supreme court may designate or select any judge of the circuit court of this state to sit temporarily as a member of the supreme court during the absence or inability of a judge of such court and while the work of the court may reasonably require the assistance of such circuit judge."

Mr. Justice George M. Brown is absent on account of sickness. Judge James W. Hamilton was called to sit as a member of this court on account of the necessary absence of Mr. Justice George M. Brown. There is, therefore, a color of title vested in Judge Hamilton. He is at least an officer *de facto*.

This same question was raised in *re Ah Lee*, (D. C.) 5 Fed. 899, in a petition for writ of habeas corpus. It was very ably presented by learned attorneys. Honorable M. P. Deady, who was present at the convention which framed the constitution of the state of Oregon, wrote an elaborate opinion. In page 907 [of 5 Fed.] is this language:

"In considering this case I have not found it necessary to pass upon the constitutionality of the act of October 17, 1878, or the validity of the appointments thereunder; for although *the act may be unconstitutional, and the appointments illegal, still if the persons appointed were judges de facto, their acts, as to third persons,* are valid, and the petitioner is not restrained without due process of law. * * * The persons appointed as judges under this act, although its unconstitutionality be admitted, and that therefore they are

not judges *de jure* or of right, are nevertheless, acting as judges of constitutionally created and existing courts, having jurisdiction to try, hear, and determine the criminal action in which the petitioner has been convicted of murder, and sentenced to receive the punishment of death when and as it took place, both in the court below and upon appeal. A person actually in office by color of right or title—not a mere usurper or intruder—although not legally appointed or elected thereto, or qualified to hold the same, is still an officer *de facto,* or in fact, and, as a matter of public convenience and utility, his acts, while so in office, are held valid and binding as to third persons.''

The quotation is taken from a decision on a petition for writ of habeas corpus. The petitioner questioned the constitutionality of the act separating the circuit and supreme courts of this state. The learned court in the case held that the court had jurisdiction of the petition since the contention was that the petitioner, Ah Lee, had been convicted of murder in the first degree contrary to due process of law. The facts are similar to a degree to the facts in the instant case.

46 C. J., 1057, § 371: ''One who holds an office under an appointment or election giving color of title may be a *de facto* officer, although the appointment or election is irregular, or invalid, or although he has been appointed by an authority not competent under the law to make the appointment, and even though *his title is derived from an unconstitutional statute.''* (Italics ours.)

Again in 46 C. J., 1006, § 213, we read: ''Title to public office can not be attacked collaterally. The question of the status of an incumbent of an office or one returned as elected can only be determined in a direct proceeding brought for that purpose, to which he is a party.''

Again in page 1060, § 378, of the same text we find: ''The acts of an officer *de facto* are as valid and

effectual where they concern the public or the rights of third persons, until his title to the office is judged insufficient, as though he were an officer *de jure,* and the legality of the acts of such an officer cannot be collaterally attacked in a proceeding to which he is not a party."

This last citation is supported by a long list of authorities, and I believe is not questioned by any respectable authority.

This court announced in *Hamlin v. Kassafer,* 15 Or. 456, 458-460 (15 P. 778, 3 Am. St. Rep. 176).

"To constitute a person an officer *de facto,* he must be in the actual possession of the office, and in the exercise of its functions and in the discharge of its duties. * * * 'An officer *de facto,*' said Storrs, J., 'is one who exercises the duties of an office, under color of an appointment or election to that office. He differs, on the one hand, from a mere usurper of an office, who undertakes to act as an officer without any color of right; and on the other hand, from an officer *de jure,* who is, in all respects, legally appointed and qualified to exercise the office. It is not in all cases easy to determine what ought to be considered as constituting a colorable right to an office, so as to determine whether one is a mere usurper." (*Plymouth v. Painter,* 17 Conn. 588, 44 Am. Dec. 574.)... The distinction, then, which the law recognizes, is that an officer *de jure* is one who has the lawful right or title, without the possession of the office, while an officer *de facto* has the possession and performs the duties under the color of right, without being actually qualified in law so to act, both being distinguished from the mere usurper, who has neither lawful title nor color of right. * * * It may be said, then, that the color of right which constitutes one an officer *de facto,* may consist in an election or appointment, or in holding over after the expiration of one's term, or acquiescence by the public in the acts of such officer for such a length of time as to raise the presumption of colorable right by election or appointment.

"From considerations of public policy, the law recognizes the official acts of such officers as lawful to a certain extent. It will not allow them to be questioned collaterally, and they are valid as to the public, and as to third persons who have an interest in the thing done. (Authorities cited.) Within the scope of his authority, the acts of an officer *de jure* are valid for all purposes. Not so with an officer *de facto;* his acts are only recognized in the law to be valid and effectual so far as they affect the public and third persons. As to these, his acts are as valid as if he were an officer *de jure.* * * * Besides, *it is against the policy of the law to allow a suit between private individuals to determine the title to an office.* Such judgment could only bind the parties, and would be of no effect as against the public."

Again in *Ex Parte Douros,* 97 Or. 39, 41, 43 (191 P. 319), we read:

"The only question upon which the court below tried the case was whether or not John Philip was a justice of the peace and clothed with the powers and duties of that office.

"Assuming that Philip was not a justice of the peace *de jure,* the record is conclusive that he was *de facto.* The distinction is clearly defined in *Hamlin v. Kassafer,* 15 Or. 456 (15 Pac. 778, 3 Am. St. Rep. 176), where it is said:". Then follows an excerpt from the case cited.

12 R. C. L. 1203, § 21, states the principle thus: "It is the well settled general rule that on habeas corpus it may be shown that the court under whose judgment or order the prisoner is deprived of his liberty had no legal existence, *for if there was no lawful court the pretended trial and judgment were absolutely void.* It is generally held, however, that this rule has no application to the case of the *de facto* judges, and that a person convicted by a judge *de facto,* acting under color of office, though not *de jure,* and detained in custody in pursuance of his sentence, cannot be properly discharged upon habeas corpus."

"A person is a *de facto* officer where the duties of the office are exercised: * * * Fourth. Under color of an election or an appointment by or pursuant to a public, unconstitutional law, before the same is adjudged to be such": 22 R. C. L. 588, § 306.

"If an *office exists de jure* the courts are uniform in asserting that the standing of the incumbent as a *de facto* officer is not impaired by the fact that the statute directing the manner in which it is to be filled is unconstitutional. Public policy requires that the acts done by persons exercising official functions, by virtue of legislative authority, which is subsequently declared void, should nevertheless be upheld." (Italics ours.) 22 R. C. L. 590, § 310. See also §§ 307-309 of same text.

We know that the supreme court and circuit courts are *de jure* offices in this state. We know that in the absence of a justice of the supreme court the statute prescribes that the supreme court may select a circuit judge to sit temporarily as a member of the supreme court while the work of the supreme court may reasonably require the assistance of such circuit judge. That statute has never been declared unconstitutional. Judge Hamilton is sitting therefore in the supreme court under color of title and is in any event a *de facto* officer.

Plaintiffs should have objected to Judge Hamilton sitting if they desired to raise a question as to his right to participate in the decision of their case. They could have done that before the case was argued and submitted to this court. If there had been any doubt, then, in the mind of Judge Hamilton or of the members of the court, he could have retired and the six justices could and would have heard and decided the case. Plaintiffs preferred to submit their case to the court, including Circuit Judge Hamilton. Having done so

and lost, they should not now be heard to say that Judge Hamilton was not competent to sit in their case. Both authorities and reason are against the position assumed by plaintiffs in their motion to recall the mandate. The motion is denied.

Argued November 13, 1929; affirmed January 14; rehearing denied February 18, 1930

## STATE *v.* HAY
(283 P. 753)

