Argued February 23; affirmed March 23; rehearing denied
April 20, 1937

# RIDDERS ET AL. *v.* RIDDERS ET AL.

(65 P. (2d) 1424)

*W. B. Shively,* of Portland, for appellants.

*Frank J. Lonergan,* of Portland, and *A. K. McMahan,* of Albany (Marks & McMahan, of Albany, and Carson & Carson, of Salem, on the brief), for respondent.

CAMPBELL, J. On October 18, 1921, Mary Ridders, Lena Ridders, and Frank Ridders, all unmarried, executed their last wills and testaments. These wills were executed at the same time, at the same place, all drawn by the same attorney, with the same witnesses, and, while not identical, were quite similar in purport, and bequeathed the bulk of each one's property to the others or to the survivors or survivor. Each will was complete in itself and made no reference to the others. Mary and Lena, in their will, named Frank as executor, and Frank's will named Lena as executor. Lena bequeathed $500 to the Benedictine Fathers at Mt. Angel, Oregon. Mary left $300 to the parish priest in charge of St. Mary's Catholic church at Albany, Oregon. Frank left $250 to the parish priest in charge of St. Mary's Catholic church at Albany, Oregon, and $250 to the Benedictine Fathers at Mt. Angel, Oregon.

On October 16, 1923, Mary died and her will was probated and the property distributed according to its terms.

On March 15, 1930, Lena revoked her will of October 18, 1921, and executed a new one. This was done, as Lena testified, with the full knowledge of Frank. Frank died September 27, 1932, without revoking or changing the will of October 18, 1921. Lena, who was named as executrix therein, presented the will to the probate court and the will was admitted to probate. The probate proceedings are still pending.

Henry Ridders, John Ridders, Ben J. Ridders and Frederick Ridders, plaintiffs herein—Henry, John and Ben being brothers of the decedent and Frederick his nephew—brought this suit against Lena and the other beneficiaries under the will and against three other heirs at law who refused to join with the plaintiffs, seeking to impress a trust upon decedent's property in favor of the heirs at law.

In the complaint it is alleged, in effect, that prior to the making of the wills, above referred to, Mary, Lena and Frank entered into an agreement to make reciprocal wills and that the wills above referred to were the result of that agreement.

It is further alleged that:

"* * * Lena Ridders and the said Frank Ridders, for a valuable consideration passing one to the other, entered into an agreement whereby each of them * * * should cancel and revoke the agreement to dispose of their property by the said reciprocal wills made on the 18th day of October 1921, as aforesaid, and that both * * * should consider the will of the other as revoked and as though no will existed and that each should be free, by a subsequent will duly made, to dispose of his respective property, and said Frank Ridders relied upon the promise of the said Lena Ridders to consider his said will of October 18th, 1921, as revoked and his estate as being intestate and that she would distribute the same among the heirs at law of the said Frank Ridders."

To this complaint, Lena Ridders filed an answer, the other defendants not appearing, which admitted the execution of the wills, but denied there was any agreement that said wills should be reciprocal and denied that she and Frank entered into any agreement regarding the revocation of said will or any part thereof.

To this answer, plaintiffs filed a reply in which they denied that the will offered for probate by Lena Ridders is the last will and testament of Frank Ridders and alleged that the will offered for probate by Lena Ridders was automatically revoked by the act of Lena Ridders in changing her will and executing a new one.

A trial was had, at which a very lengthy record was made, and the trial judge found in favor of defendant Lena Ridders, dismissed plaintiff's complaint and declared Lena to be the sole owner of the residue of decedent's estate. Plaintiffs appeal.

Lena Ridders, the only answering defendant in the court below, is the sister of Frank Ridders, the deceased, and, at the time of the trial, was 52 years and eight months of age. She was born and raised on what is known as the Ridders farm in Benton county about 12 miles from Corvallis and not far from Albany. To her father and mother, twelve children were born. Some died and others moved away to make homes for themselves. The father died in 1892, and at the time of the mother's death in 1913 three children remained on the farm, Mary, Lena and Frank. None of these three children ever married.

Mary had been an invalid before her death for over 30 years. Part of that time she was bedfast, blind and had lost the power of speech. She subsequently regained her speech and during the later years of her life was able to move around in a wheel chair.

Frank, the brother, tended to the farm, and Lena took care of her sister Mary and performed the household duties. It is needless to say that taking care of an invalid, so sorely afflicted as was Mary, was an arduous task. Throughout the protracted illness of the mother, Frank and Lena maintained the home and

tended Mary faithfully, and continued to do so for a period of over 10 years after the mother's death.

There was much testimony to show that the relationship between the three children was very affectionate, helpful and mutually considerate. Many witnesses testified that they were "friendly" towards each other; "I never saw anybody get along better"; "it was just wonderful, I thought they got along as nice or nicer than any family I ever saw"; and more testimony to the same effect and no testimony to the contrary.

It would appear that these people having passed the middle year of the biblical span of life allotted to man, began to think that death might overtake them at any time. So Frank advised his sisters that he intended to make a will. The sisters suggested that they would like to do the same and informed Frank how they wished to dispose of their property. Frank thereafter consulted the late Honorable Gale S. Hill, who had long been the family's legal adviser, and employed him to prepare the wills in accordance with the wishes of himself and sisters. Because of the affliction of Mary and her inability to get around, it was decided that Mr. Hill, after preparing the wills, should come out to the home and there have the wills executed and published. Frank at that time suggested that Mr. Hill and his partner Mr. Marks when they brought out the wills to come early and partake of a pheasant dinner. The two lawyers arrived at the farm about 5:30 p. m. Lena prepared the dinner and present at the table were Mr. Hill, Mr. Marks, Lena and Frank; Mary not being able to sit at the table remained in the sitting room. During the course of the meal nothing was said in regard to the wills. After dinner they withdrew to the parlor,

where, after some conversation, none of which related to the wills, Mr. Hill informed them that he had brought the wills with him. He read Mary's will first and then asked her if it was in accordance with her wishes. After replying in the affirmative, Mary signed the will and it was witnessed by Mr. Hill and Mr. Marks. The same procedure was followed in respect to the wills of Lena and Frank.

Both Lena and Mr. Marks, the only members of the company there assembled who are living today, testified that at no time during the course of the evening was anything said in respect to any agreement or contract to make reciprocal and mutual wills.

It is plain that the reason the wills were executed all at one time, in the manner in which they were, is because of the fact that Mary was unable to get around; the business could be consummated conveniently at one time and at one place.

Mr. Hill, of course, drew all three wills, but he had been the family attorney for many years and there is nothing significant in his drawing all three wills.

When Lena changed her will in 1930, she consulted Mr. Hill who drew up the new will and Mr. Marks witnessed it. Mr. Marks testified that nothing was said at that time regarding any agreement between Lena and Frank in respect to the new will. After Mary's death, Lena and Frank continued to live on the homestead and at the death of Frank his will left the bulk of his property to Lena.

Plaintiffs contend that the wills executed by Mary, Frank and Lena were mutual and reciprocal wills and evidenced an agreement to leave their property to each other; that when Lena revoked her will, in 1930, the

will of Frank automatically became revoked, and therefore the will attempted now to be probated is invalid.

"The cases are legion involving contracts to devise and bequeath property. They may be generally grouped or classified as follows: (1) Cases wherein the wills themselves disclose a contract or agreement to make certain disposition of property. In this class of cases the wills refer to each other and generally contain a recital that each will is made in consideration of the other. (2) Cases in which the claimants assert an agreement whereby certain services of a peculiar and personal nature were rendered in consideration of a promise to devise or bequeath property. (3) Cases where the wills themselves do not refer to each other or disclose any contract, but which are nevertheless taken into consideration, together with all of the facts and circumstances surrounding their execution, in determining the existence of an alleged contract. The cause of the plaintiff, if any exists, comes within the last named classification." *Taylor v. Wait*, 140 Or. 680 (14 P. (2d) 283).

There is no competent evidence of a contract made between the two sisters and the brother at or prior to the time of October 18, 1921, the time that the wills were executed, unless we should say that the wills themselves were evidence of an agreement.

■ Separate wills wholly independent of each other, made by close relatives bound together by ties of love and affection, bequeathing property to each other, do not create an inference or a presumption, in the absence of other evidence, that such wills were the result of a contract or that any mercenary consideration entered into the making thereof. Such wills are a natural disposition of property.

"Again, the discussion by two persons bound to each other by the closest ties of affection as to disposition

of their property resulting in separate wills by which the property of each was left to the other, affords no grounds for the inference that either undertook or exacted a legal obligation. Such action may be far more reasonably attributed to the promptings of affection, and courts should not introduce the mercenary element except upon clear affirmative proof that it was present within the understanding of both parties. * * *

"This flowing together of life, thought and action so far from importing that what they did for each other was the result of contract, a benefit received being regarded the consideration of another bestowed, connotes the mutual bestowal of benefits growing out of devotion and intimate association entirely independent of consideration and without thought of contract. Contract imports the standing apart and coming together as the result of an agreement for a consideration. The distinction is forcibly illustrated by the case of *Gardner v. Gardner*, 49 S. C. 62, where the parties stood in antagonism to each other, and after the execution of a will by one, as it was alleged, in pursuance of a contract to settle the dispute, the others ceased to press their claim. On the other hand, these wills were the result of the union of life and purpose, and not of a negotiation between the sisters in which each as a separate party represented her own interest. It was most natural that each should wish to bestow upon her sister her entire property, and no contract can be implied from the fact that this reasonable and natural testamentary disposition was made. That the wills were made at the same time is of little, if any, significance, when the close association and common life are considered." *Wilson v. Gordon*, 73 S. C. 155, 160 (53 S. E. 79).

■ To establish an oral contract between two persons to make reciprocal wills after the decease of one of the parties requires unambiguous, clear and convincing evidence: *Holman v. Lutz*, 132 Or. 185 (282 P. 241, 284 P. 825); *Taylor v. Wait*, 140 Or. 680 (14 P. (2d) 283);

*Schramm v. Burkhart,* 137 Or. 208 (2 P. (2d) 214); *Tate v. Emery,* 139 Or. 214 (9 P. (2d) 136); *Stevens v. Myers,* 91 Or. 114 (177 P. 37, 2 A. L. R. 1155).

The wills being separate and independent, and not being made by virtue of any contract or agreement, the makers could change or revoke them at pleasure without in any manner affecting the wills of the others and this is evidently what happened. It appears that Frank placed the will made by Lena on October 18, 1921, in his safe deposit box in the First National Bank at Albany, and when Lena advised him that she wished to change her will, they went to the bank together and he delivered up her will to her. He did not see fit to change his own will and was undoubtedly satisfied with the disposition of his property made therein.

Holding as we do, that there was no agreement entered into between Mary, Lena and Frank to make reciprocal wills, the other contentions of plaintiffs become moot questions, and their consideration is unnecessary for the proper disposition of this cause.

The decree of the circuit court is affirmed. It is so ordered.

BEAN, C. J., and BAILEY and ROSSMAN, JJ., concur.