Argued June 15, reversed July 6, 1960

ERNEST ET UX *v.* PEZOLDT ET AL

393 P. 2d 621

*Keith A. Caldwell* and *Robert E. Thompson*, Portland, argued the cause for appellants. With them on the briefs were Richard E. Paul, Portland, and Castles & Musick, Beaverton.

*Francis F. Yunker*, Portland, argued the cause and filed a brief for respondents.

Before McAllister, Chief Justice, and Perry, Sloan, O'Connell and Millard, Justices.

MILLARD, J. (Pro Tempore)

This is an appeal by defendants from a decree of the circuit court of Multnomah county rendered in a suit wherein plaintiff Marie Ernest, joined by her husband Paul Ernest, claimed that her deceased brother, Walter Rudolph, prior to his death, entered into an agreement with plaintiffs, under which plaintiffs and the decedent agreed to make and execute mutual reciprocal wills whereby the survivor would become the residual legatee of all the property of the deceased parties and that her said brother violated the agreement by willing one-half his property to a woman named Rose Lena Pezoldt, one-fourth to her small granddaughter, Rose Signe Haga, her mother Rose Haga being appointed executrix, and one-fourth to Marie Ernest. This will was dated October 19, 1956, and was admitted to probate. The trial court found in favor of the plaintiff and impressed a trust in favor of the plaintiffs on all the property of the Rudolph estate, subject to debts and expenses.

It appears from the evidence that Marie Ernest and both her husband Paul and brother Walter Rudolph came from Germany. The parents of Mrs. Ernest and Walter had other children who still reside

in East Germany under Russian domination. Marie and her husband first came here about 1921, and Walter, with their help, came in 1930. He resided with them for the rest of his life. There is evidence that his sister and her husband assisted him on his arrival, but later he paid board and room. The Ernests are about 65 years of age, and Walter was about 67 years of age when he died. Walter worked as a baker and accumulated an estate of about $17,000. While working at the Multnomah hotel he became acquainted and friendly with another employee, defendant Rose Pezoldt, and her small granddaughter, Rose Signe Haga, who is referred to as his "little friend" and who visited in the Ernest house in his company. Walter never married.

In March, 1946, the Ernests purchased an apartment dwelling called a fourplex. The person who made the sale suggested they should have wills drawn and pursuant to that conversation they immediately engaged an attorney who drew wills for both of them, which they executed in the presence of witnesses and which have not been changed. Except for names, the Ernest wills were alike, and by them each left his property to the other. Each of the wills also contained this provision:

> "In the event my said wife [husband] and I should perish in a common catastrophe, regardless of the presumption as to who should die first, then in such event I give, devise and bequeath all the rest and residue of my estate of every nature and kind unto my brother-in-law [brother] Walter Rudolph, and request that he be allowed to serve as executor of this my Last Will and Testament without bond."

There was nothing in either will indicating that either intended mutual or reciprocal· wills, nor was

any mention made of Walter Rudolph other than as above stated.

We are satisfied that Walter Rudolph at this point did not know anything about the making of these documents. Upon the Ernests returning home they claim they told Walter that they had made the wills. Marie testified that "Well, I told him [Walter Rudolph] we made a will so everything would be just between the three of us together and if anything happens to my husband, so it goes to me, and if anything happens to me it goes to him" and again, "Well, the last living gets everything." Pursuant to somewhat leading questions, Marie further testified they all agreed to this and that if the wills were changed they would let each other know. It later appeared that this witness was merely giving her conclusions, for on cross-examination after testifying concerning the buying of the fourplex and the advice then given about the advisability of drawing wills, Marie testified as follows:

"Q Now, you talked to the man that you bought the fourplex from about this and he advised you should have wills. Was Walter there at the time or just you and your husband?

"A Where we made out the paper, Walter wasn't there with us—when we bought it.

"Q So, now, then when Walter got home or was home, and you were all gathered around the dining room table, as I understood you, you told Walter what?

"A We told him we made a will and it was all with us, the three together.

"Q You had that agreement?

"A *He said, 'That is okeh,' Walter says, 'if I get time, I will make a will and make everything over to you.'*

"Q All right. Now, let's go back a moment if you please. Now, what did you and your husband both say to Walter as to what you were going to do between the two of you? What did you say to Walter?

"A We says, 'Walter, I made my will over to my husband and I pass away my husband gets everything, and then when we are both dead, everything goes to you.'

"Q Now, that is what you told him, isn't it; is there anything else you told him beyond that, Mrs. Ernest; did you say anything more at that time?

"A Well, he said, 'As soon——

"Q Not what 'he' said. What you said?

"A What I said?

"Q Yes. Did you say anything more?

"A Well, I says, 'We made the will and everything goes over to you if anything happens to us.'

"Q Had you already made your will when you told Walter that?

"A When he came home, I showed Walter our wills." (Emphasis supplied.)

Marie further again testified that it was on this occasion that the matter was first discussed with Walter and that upon their deaths "he was to get everything." While she testified that she showed the wills to Walter, there was no testimony that he read them. Again she repeated her previous testimony, for upon being asked as to Walter's exact words, she replied, "He said as soon as I have time I will make the will over to you." She further testified that Walter did not make a will until two or three years later when he showed her his will wherein he left his property to plaintiffs. She didn't know what he did with this document or what became of it; neither did she ever inquire nor did she ever request that he draw a will.

Paul Ernest testified in effect that Walter agreed

with them that each should will his or her property so that "what gets all who lives the longest." When asked by his own counsel to state what he said and what Walter said, he appeared to testify partly as to his conclusions as to whether or not there was an agreement, except that he did testify that Walter said he agreed. He also testified that Walter later had a will made out in accordance with this. He further stated that Walter's will was made out "maybe two years— a year and a half" afterward and that he didn't know exactly. Paul testified Walter showed him this will and that it was made out by attorney Ofner and that the attorney's name was on it. It appears that Mr. Ofner has since passed away, and the assistant trust officer of the bank who had charge of his estate was unable to find any copies of this purported will or anything to show that he represented Walter, although they did find 10 or 12 original wills and about 60 copies of other parties' wills in his effects. Except as above stated, Paul's testimony does not expressly contradict his wife's testimony as to how the will matter was presented to Walter and his reply thereto. This purported will was not found in Walter's safety deposit box nor at all, but only the will that was probated which was drawn by attorney James Castles who appears here as attorney for Rose Haga as guardian ad litem of Rose Signe Haga and as executrix. Incidentally, it does not appear here that either appellant knew of Walter's will until after his death.

Plaintiffs called several neighbors who were well acquainted with plaintiffs and Walter and who either testified that Walter had said he intended to will his property to the Ernests or that he said he had an agreement with them to do so, or had made his will to that effect. As to the last, it will be remembered

that Marie testified that Walter's will to the Ernests was made two or three years later. Paul Ernest thought one and one-half to two years later, but he also said he couldn't remember. If Marie was correct, the will would not, in any event, have been drawn before 1948.

Defendants contend that the trial court erred in impressing a trust on decedent's property in favor of plaintiffs and in finding that Walter Rudolph had entered into a contract to will his estate to plaintiffs, as there was no clear, convincing and satisfactory evidence supporting such alleged contract.

■ An agreement to make reciprocal wills is required to be definite and certain in all its parts, be mutual, founded upon an adequate consideration and established by the clearest and most convincing evidence. *Sappingfield v. King,* 49 Or 102, 110, 89 P 142, 90 P 150, 1 LRA NS 1066. In *Stevens v. Myers,* 91 Or 114, 133, 134, 177 P 37, the court in quoting from other authority indicates that generally mutual or reciprocal wills must be based upon a valid consideration before equity will impress a trust to prevent fraud.

It is not contended in this case that any consideration was given to induce Walter to make his will in plaintiffs' favor other than the alleged promise of the Ernests to make and retain reciprocal wills in his favor.

"To establish an oral contract between two persons to make reciprocal wills after the decease of one of the parties requires unambiguous, clear and convincing evidence: Holman v. Lutz, 132 Or. 185 (282 P.2d 241, 284 P. 825); Taylor v. Wait, 140 Or. 680 (14 P. (2d) 283); Schramm v. Burkhart, 137 Or. 208 (2 P. (2d) 214); Tate v. Emery, 139 Or. 214 (9 P. (2d 136); Stevens v. Myers, 91 Or. 114 (177 P. 37, 2 A.L.R. 1155)." *Ridders v. Ridders,* 156 Or 165, 172, 65 P2d 1424.

See also *Harris v. Craven*, 162 Or 1, 19, 91 P2d 302; *Smith v. Vehrs*, 194 Or 492, 499, 242 P2d 586; *Wagner v. Savage, as Adm'r*, 195 Or 128, 149, 244 P2d 161.

In *Holman v. Lutz*, supra, at p 208, it was held that an irrevocable contract must be established by "the most clear and satisfactory evidence." In *Wagner v. Savage, as Adm'r*, supra, at p 149, it was held "there must be proof of a binding agreement that is clear, just, definite, reasonable and mutual in its obligations, in all parts." In *Hawkins v. Toombs et al.*, 194 Or 478, 483, 242 P2d 194, it was explained that the reason for these rules arose from the fact that oral contracts of this nature, if established, operated to defeat a duly executed will, and because one of the parties is dead the version of that party is not available, and, hence, it is of the utmost importance that the evidence in behalf of the survivor be carefully scrutinized. Indeed, in *Stever v. Holt*, 164 Or 195, 212, 100 P2d 1016, it was stated that suits to estabilsh contracts to make a will "are viewed with suspicion and distrust, not only by the layman but also by the courts. The proof required for their establishment must be clear and satisfactory."

We now turn to a consideration of these rules as applied to the evidence in this case. Plaintiffs' evidence is replete with leading questions. For example, on direct examination in questioning Paul Ernest, plaintiffs' counsel asked: "Well, was anything said at the time that you would make those wills and stick to it or not?" To this the witness answered "Yes." The witness had not prior thereto volunteered this information. Many of the neighbors and acquaintances called as witnesses testified they knew about "an agreement," but in many instances it is just not clear what they meant by that term. Bertha Niehoff, a neighbor, testified she knew about the agreement. When asked,

in effect, what Walter Rudolph told her she stated: "Well, he said that [they were] the only relation he has here in this country and it is more than right to leave it to his sister and brother-in-law." That, of course, did not disclose an agreement, and plaintiffs' counsel immediately asked her: "Did he say anything about an agreement and they leave everything to him and he left everything to them," to which the witness answered "Yes." Norma Jacoby, of German descent, who lived next door to the Ernests, when asked by plaintiffs' counsel if she knew "about this agreement that they had" with reference to their wills, answered in the affirmative. On further examination as to what the parties said, she stated: "Well, it was always said that if something happened to Mr. and Mrs. Ernest they would leave their property and belongings to Walter and if something happened to Walter it would go to them." This is one of the witnesses who testified that Walter told her in 1946, 1947, and 1948 that he had left his property to the Ernests. Herman Niehoff testified to the same effect, and he also testified that Walter told him in 1946 and 1947 that he had made a will to the Ernests.

Witness Einar Carlson, called by plaintiffs, testified that he worked with Walter for several years at the Multnomah hotel as a baker and that Walter had told him that he and the Ernests had made out wills and that whoever died last would get the money. Plaintiffs' counsel then asked this leading question: "And did he tell you that he had an agreement as to that?", to which the witness answered "Yes." The term "agreement," as interpreted by a layman, does not necessarily imply a legally binding contract. The testimony of these witnesses who were not parties could just as well be interpreted to mean that Walter intended to

leave his property to his sister and brother-in-law, rather than that he had entered into an irrevocable contract to so will his estate.

■ In any event, we do not have to depend on generalities here, as we have before us the testimony of Marie Ernest specifically stating just what actually occurred. She testified that after Walter was told about the making of the Ernest wills he stated that it was "okeh" and further "if I get time I will make a will and make everything over to you." While the testimony of Paul Ernest impliedly contradicts some of Marie's testimony it did not directly do so. Further, there is the fact that if Walter did make a will he did not do so according to Marie for two or three years after the Ernests had made their wills, which was in March, 1946. Nor was he ever thereafter requested to do so. Under these circumstances we cannot say with any degree of certainty that Walter agreed to be irrevocably bound and that there were mutual promises, each constituting consideration for the other. Since the Ernests' wills were already executed prior to the initial conversation, consideration does not lie there. It must be found in mutually contractual promises. In any event, the evidence on that is so uncertain that we cannot say that the purported contract to make contractual wills has been established by unambiguous, clear and convincing evidence or that there was any mutual obligation to make a will, as is required. Rather, we are inclined to the view expressed in *Ridders v. Ridders,* supra, at pp 171-172, in quoting other authority wherein it is stated:

> " '* * * the discussion by two persons bound to each other by the closest ties of affection as to the disposition of their property resulting in separate wills by which the property of each was left

to the other, affords no grounds for the inference that either undertook or exacted a legal obligation. Such action may be far more reasonably attributed to the promptings of affection, and courts should not introduce the mercenary element except upon clear affirmative proof that it was present within the understanding of both parties.' "

■ There is also another reason why plaintiffs' contentions may not be sustained. In the amended complaint plaintiffs allege that the Ernests and Walter Rudolph mutually agreed to and did execute mutual wills providing that the survivor of the said parties should become "the residuary legatee of all the property of the other two parties." Taking the most favorable view of plaintiffs' evidence, it would appear that even under their theory they were obligated under the purported contract to will all their property to Walter upon their deaths. Both testified to that effect. While Paul testified that their wills were shown to Walter, it does not affirmatively appear that he read them. Plaintiffs' wills do not in the event of their deaths leave all their property to Walter but only provided that he was to inherit in the event plaintiffs should perish in a common catastrophe. In *Losey v. O'Hair*, 160 Or 63, 73, 83 P2d 493, it was held before contracts to make a will may be enforced "there must be strict performance by the promisee of all the terms and conditions of the contract." See cases there cited. See also Restatement of the Law of Contracts 750, § 397, which states that "A breach or nonperformance of a promise by one party to a bilateral contract, so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty." Since plaintiffs failed to keep their alleged unqualified promise to will their property to him but only provided

that he take in the event of a common catastrophe and thus failed to perform, they are now in no position to insist on performance.

In view of the conclusions reached, it becomes unnecessary to review the other assignments of error, and the trial court is, therefore, reversed.